**George A. LUNA, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee**

2013-SC-000173-MR

Supreme Court of Kentucky.

RENDERED: FEBRUARY 19, 2015

Rehearing Denied June 11, 2015

COUNSEL FOR APPELLANT: Molly Mattingly, Assistant Public Advocate, Department of Public Advocacy

COUNSEL FOR APPELLEE: Jack Conway, Attorney General of Kentucky, Gregory C. Fuchs, Assistant Attorney General

OPINION OF THE COURT BY CHIEF JUSTICE MINTON

A circuit court jury convicted George A. Luna of first-degree murder and first-degree arson for killing Debra Hendrickson and burning the trailer where she lived. The jury also found as a statutory aggravator that Luna murdered Hendrickson in the commission of first-degree robbery. As a result, Luna was sentenced to imprisonment for life without the possibility of probation or parole. Appealing the resulting judgment as a matter of right,[1] Luna now presents a host of arguments for this Court's consideration. We reverse Luna's first-degree arson conviction and sentence but affirm Luna's first-degree murder conviction and his sentence of life imprisonment without possibility of probation or parole.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

A neighbor arrived home around 8:00 on the evening of September 8, 2007, to find Debra Hendrickson's trailer on fire. By the time firefighters arrived, the flames were so widespread they could not enter until water was applied, a situation known in firefighting parlance as a fully involved fire. The neighbor observed that Hen-

1. Ky. Const. § 110(2)(b).

drickson's truck was gone and assumed she was not at home at the time. But Hendrickson lay dead inside. After the fire, her body was recovered from the debris.

A few months before the fire, Luna had taken up residence with Hendrickson, rent-free. The two had become acquainted several months earlier. A journeyman bricklayer by trade, Luna traveled as jobs required, returning to Hendrickson's home and staying with her between jobs. As a result, Luna's tenancy with Hendrickson was fairly sporadic, primarily on weekends.

Hendrickson and Luna, despite their living arrangement, and, according to Luna, Hendrickson's repeated advances, were not romantically linked. Their relationship was reportedly filled with conflict. Hendrickson's family and friends described various instances of physical abuse inflicted upon Hendrickson by Luna. Likewise, during his testimony at trial, Luna recounted examples of her physical abuse of him, including inflicting a gunshot and stab wound. And, as we will discuss in more detail below, Luna and Hendrickson engaged in various insurance-fraud schemes.

Earlier in the afternoon before the fire, Luna accompanied Hendrickson into Paducah, about 30 minutes from Hendrickson's trailer in Marshall County, Kentucky. The two visited a couple of bars, ate, and drank beer. Before returning home, they stopped at a liquor store. According to Luna, Hendrickson encountered a potential boyfriend, and she told Luna the man would be coming over later that night. Hendrickson drove Luna home in her truck, a truck that Luna was allegedly in the process of buying from Hendrickson.

According to Luna, he was eager to see his daughter in Illinois, so upon returning home he began packing his clothes and tools to get on the road. Hendrickson waved from the front porch, beer in hand, as Luna pulled out of the driveway. Luna reached Paducah before he realized he had left his level in Hendrickson's garage, so he turned around and drove back to Hendrickson's trailer.

Upon arrival, Luna did not enter the trailer but went directly to retrieve the level from the garage. As he returned to his vehicle, Luna thought he saw flames through a window in the trailer. According to Luna, he thought little of the flames. Supposing he was drunk and sensing things that were not there, he drove away. But while driving to Illinois, he called 911 several times to report a potential fire. While on the phone with the 911 dispatcher, Luna was unable to provide Hendrickson's address or even her surname, claiming he did not know it. Eventually, Luna hung up on the dispatcher, but then became belligerent with her when she called him back seeking more information.

At 7:34 on the evening of the fire, an Illinois State Trooper clocked Luna traveling through southern Illinois at 100 miles per hour. Luna was arrested there.

Following a short investigation and his extradition to Kentucky, Luna was indicted on charges of first-degree murder and first-degree arson. A jury trial conducted in 2008 resulted in Luna's conviction of all charges and a sentence of life imprisonment. On appeal, we reversed that judgment and remanded for a new trial.[2] On retrial, Luna was again tried for and convicted of first-degree murder and first-

---

**2.** *See Luna v. Commonwealth,* 2010 WL 4683564 (No. 2008–SC–000652–MR Nov. 18, 2010).

degree arson. Unlike the first trial, the Commonwealth sought a finding of statutory aggravators on retrial. The jury found aggravating circumstances and sentenced Luna to life imprisonment without possibility of probation or parole. The trial court entered judgment accordingly.

## II. ANALYSIS.

Luna presents for our consideration on appeal twelve issues, each of which we discuss in turn.[3]

### A. We Reject the Commonwealth's Assertion that the Law–of–the–Case Doctrine Bars Consideration of a Number of Luna's Issues on Appeal.

▇▇▇ Before reaching Luna's substantive attacks on his conviction, we address the Commonwealth's attempt to rebut several of Luna's arguments with the law-of-the-case doctrine. As a general matter, when referring to the law of the case, we are describing "a handful of related rules giving substance to the general principle that a court addressing later phases of a lawsuit should not reopen questions decided by that court or by a higher court during earlier phases of the litigation."[4] Within this handful of rules, one is of primary relevance for this case: "issues decided in earlier appeals should not be revisited in subsequent ones."[5] To this end, our case law has extended the law-of-

the-case doctrine from only previously decided appellate issues to "decisions of the trial court which could have been but were not challenged in a prior appeal."[6]

This extension of the doctrine is the gravamen of the Commonwealth's response to Luna's arguments. The Commonwealth's view, taken to its end, would essentially preclude appellate review of any issue that was not objected to in Luna's first trial. Our law-of-the-case jurisprudence, primarily *Commonwealth v. Schaefer*,[7] at one point perhaps supported the Commonwealth's position in the present case. But with our later decision in *Brown,* our jurisprudence clearly no longer stands for such a proposition.

▇▇▇ With regard to earlier trial court rulings, the law-of-the-case doctrine only applies "where a ruling of law is made based on existing law and that ruling has gone unchallenged during the original appeal."[8] The issue must be presented to the trial court and the trial court must affirmatively rule in order to trigger the law-of-the-case doctrine. Here, of course, Luna has been before this Court previously, so the law-of-the-case doctrine is certainly potentially applicable. Fatal to the Commonwealth's law-of-the-case argument, however, is its failure in the present appeal to direct us to the record of Luna's original trial where the trial court ruled on the merits of issues Luna now presents.[9]

---

3. Unless otherwise noted, all issues are properly preserved for our review.

4. *Brown v. Commonwealth,* 313 S.W.3d 577, 610 (Ky.2010).

5. *Id.*

6. *Id.*

7. 639 S.W.2d 776, 777 (Ky.1982) (noting that this Court is without "power on a second appeal to correct an error in the original judgment which either was, or might have been relied upon in the first appeal.").

8. *Brown,* 313 S.W.3d at 611 (internal quotation marks omitted).

9. For example, the Commonwealth argues Luna's challenge to the admissibility of his altercation with a state trooper while in custody in Illinois is governed by the law of the case because (a) Luna did not object to the admission of this evidence at the first trial and (b) this Court included the altercation in our recitation of the facts in our 2010 opinion. This stretches the law-of-the-case doctrine beyond recognition, at least as we recognize it post-*Brown.* The Commonwealth fails

Because the Commonwealth is attempting to use the law-of-the-case as a shield against Luna's arguments, the Commonwealth bears the burden of showing its applicability.[10]

██ To apply successfully the law-of-the-case doctrine and bar Luna's present issues, the Commonwealth must show that Luna's present issues were not only presented to the trial court in the earlier proceeding but received an affirmative ruling from the trial court in that proceeding. Potential errors that passed unpreserved by contemporaneous objection and ruling in the earlier trial are not automatically cleansed by the law-of-the case doctrine for a reprise on retrial. Simply stated, if inadmissible evidence came in without objection and a ruling by the trial court in a first trial, a party opposing its admission at retrial must make an objection.

Thus, the Commonwealth's reliance on *Schaefer* is misplaced. While nearly all of the issues presented by Luna involve evidence or issues that were present in the first trial, we are not provided with any indication that the trial court ruled on them in the first trial. We can appreciate the efficiency of the law-of-the-case doctrine in situations like the instant case where the evidence presented on retrial is substantially similar and nearly identical in the case of some witnesses. But we should not promote reliance on the law-of-the-case doctrine out of simple convenience. Accordingly, we conclude that the law-of-the-case doctrine is not a bar to the consideration of Luna's issues in the present appeal.

## B. The Trial Court Properly Denied Luna's *Daubert* Challenge to the Commonwealth's Arson Investigator.

We must admit to a degree of confusion regarding Luna's argument on this issue. Luna seemingly vacillates between arguing the science behind the arson investigator's testimony is faulty to focusing on the conduct undertaken by the arson investigator in compiling his report to focusing solely on the conduct of the trial court. We are certain, however, that any error in the admission of the arson investigator's testimony was harmless.

Luna's argument seems to be presented on two fronts: (1) the trial court's hearing conducted under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[11] was unfair because the Commonwealth did not produce its witness and (2) the hearing was cut short. In both the retrial and the original trial, the Commonwealth presented testimony from the same fire-and-explosives investigator from Kentucky's Office of the State Fire Marshal. This testimony, built upon observations and analysis performed at the scene of the fire close in time to the fire's extinguishment, centered on the arson investigator's conclusion that the fire

---

to mention a previous objection or pre-trial motion or anything of the like ruled on by the trial court. And, it almost goes without saying that our mere mention of testimony or factual allegations now alleged to be inadmissible does not constitute an affirmative ruling of any sort and does not invoke the law-of-the-case doctrine. Again, the law-of-the-case doctrine requires more than the mere *opportunity* for a trial court to rule; it requires that the trial court *did* rule.

10. *See, e.g., Commonwealth v. Jones,* 283 S.W.3d 665, 670–71 (Ky.2009). We, of course, are not now labeling the law-of-the-case doctrine as an affirmative defense but drawing a simple analogy. The party arguing the law-of-the-case applies bears the burden of proving its applicability.

11. 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

was "incendiary," i.e. intentionally set.[12]

When faced with the prospect of expert testimony under Kentucky Rule of Evidence (KRE) 702, the general outline of the trial court's gatekeeping[13] role is to ask whether the expert proposes to testify to scientific, technical, or other specialized knowledge that will assist the fact-trier in understanding or determining a fact in issue.[14] This requires the trial court to discern whether the proposed testimony is both relevant and reliable. Relevancy, in this context, has been repeatedly described as one of "fit":

'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.... The study of the phases of the moon, for example, may provide valid scientific[, technical, or other specialized] 'knowledge' about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However, (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night.[15]

Reliability, on the other hand, focuses on the "validity of the reasoning and methodology upon which the expert testimony is based."[16] Taken together then, a trial court's overall inquiry is "whether the reasoning or methodology underlying the testimony is scientifically valid and [ ] whether that reasoning or methodology properly can be applied to the facts in issue."[17] Whether a witness properly qualifies as an expert is within the scope of the trial court's discretion. Accordingly, we review for an abuse of that discretion.[18] Any factual determinations made when reviewing an expert's reliability, however, we review for clear error.[19]

While there is no immutable rule that a trial court conduct a hearing on the admissibility of a potential expert's testimony,[20] rare is the situation where a hearing is not necessary. A trial court should refrain from ruling without the benefit of a hearing except in the narrow

---

12. We note that the law-of-the-case might apply to this situation if the Commonwealth showed us that the trial court made a ruling under *Daubert* in the original trial on the reliability or qualifications of the arson investigator. But the Commonwealth has shown us nothing on this point from the original trial and our examination of the record of the original trial has failed to unearth a *Daubert* motion or hearing regarding this potential expert witness. Of course, the arson investigator did testify as an expert in the original trial, so we might presume the trial court's tacit approval under *Daubert*. But lacking a clear indication in the record of the original trial, we are hesitant to extend the law-of-the-case to a point where it would apply to the present case.

13. *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786.

14. *Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 39 (Ky.2004).

15. *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 578 (Ky.2000) (alterations in original).

16. *Toyota Motor Corp.*, 136 S.W.3d at 39.

17. *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786.

18. *Goodyear Tire*, 11 S.W.3d at 577–78.

19. *Hyman & Armstrong P.S.C. v. Gunderson*, 279 S.W.3d 93, 101–02 (Ky.2008) ("An appellate court's standard of review relative to a ruling on the reliability of scientific evidence under *Daubert* is whether the ruling is supported by substantial evidence.") (citing *Miller v. Eldridge*, 146 S.W.3d 909, 917 (Ky. 2004)).

20. *Commonwealth v. Christie*, 98 S.W.3d 485, 488 (Ky.2002).

instance "when the record before it is complete enough to measure the proffered testimony against the proper standards of reliability and relevance."[21] Determining the admissibility of expert testimony on an inadequate record is an abuse of discretion.

Before the retrial, Luna filed a motion challenging the reliability of the arson investigator's testimony under the requirements of *Daubert.* The trial court conducted a *Daubert* hearing to receive testimony on the science and methodology at issue.

■ First, Luna argues the *Daubert* hearing was improper because the Commonwealth was not forced to produce the arson investigator and the burden was effectively shifted to Luna because he was forced to produce witnesses first. Luna's argument is both meritless and a mischaracterization of the record. At the *Daubert* hearing, counsel for the Commonwealth noted that he and Luna's counsel had *agreed* to allow the Commonwealth to wait until the close of Luna's proof before producing any witnesses. Practicality was the basis for this agreement: The Commonwealth wanted to avoid bringing lab technicians and the arson investigator to Trigg County from Frankfort until their physical presence in the trial court was necessary. Whether this was an appropriate agreement of counsel is of little meaning. The point is, Luna's counsel agreed to conduct the hearing in the order Luna now contends was erroneous. We obviously reject this notion.

■ Second, Luna contends the trial court abused its discretion by ending the hearing before mandating the Common-

wealth produce witnesses. This argument is likewise meritless. Toward the end of Luna's proof regarding the science used by the Commonwealth's arson investigator, the trial court interrupted and inquired pointedly into Luna's goal for the *Daubert* hearing. The trial court then concluded that there had been no proof put forward by Luna that called into doubt the science underlying the report of the Commonwealth's arson investigator. In fact, all of Luna's witnesses recognized the arson investigator used valid science, albeit not their preferred method. Luna now argues that without requiring the Commonwealth to produce the arson investigator to testify at the hearing, there was no way for the trial court to make a determination of whether the arson investigator had reliably applied his methodology to the facts of this case

■ We remind Luna that a *Daubert* hearing is *not* required. Of course, a trial court making a finding on an inadequate record abuses its discretion. But, important here, it is worth re-emphasizing that "the record upon which a trial court can make an admissibility decision without a hearing will consist of the proposed expert's reports, affidavits, deposition testimony, existing precedent, and the like."[22] The trial court has more than just the testimony at a *Daubert* hearing at its disposal to determine the admissibility of expert testimony. Given the record, the trial court did not find it necessary to hear live testimony from the arson investigator himself.[23] The arson investigator's report, detailing his findings and methodology, was available to the trial court. That may have been sufficient to indicate the arson inves-

---

21. *Id.* (quoting *Jahn v. Equine Srvs. P.S.C.,* 233 F.3d 382, 393 (6th Cir.2000)) (alteration omitted).

22. *Id.* at 488–89.

23. We note that the trial court had heard this same witness testify live about the same report in the original trial.

tigator reliably applied his methodology to the facts of this case, especially given the fact that no witnesses were produced challenging the arson investigator's science as "junk science." Most, if not all, of the issues Luna raises with regard to the trial court ending the hearing involve weight not admissibility.[24] Furthermore, the trial court noted that Luna may still have an argument under KRE 403—exclusion of otherwise relevant information substantially outweighed by danger of undue prejudice or confusing or misleading the jury— he just had not presented a sufficient argument under KRE 702.

 Because controlling the order of a *Daubert* hearing rests within a trial court's discretion, great leeway is warranted to allow the trial court to develop the record it needs to make a sound determination. The instant *Daubert* hearing may be considered unorthodox, but it cannot be considered arbitrary, unfair, or unsupported by sound legal principles, in light of the record and evidence.[25]

 In any event, even if, for the sake of argument, we found error in the *Daubert* hearing conducted by the trial court here, that error would undoubtedly be harmless. To reach his "incendiary" conclusion, the arson investigator used a hydrocarbon detector, often called a "sniffer," in an attempt to detect the presence of any accelerants, *e.g.* gasoline, kerosene. The problem, according to Luna, is a hydrocarbon detector is unreliable for purposes of *Daubert*. Luna's witnesses at the *Daubert* hearing testified that while a hydrocarbon detector is a valid scientific device or technique, it reacts to far too many substances to provide any meaningful results. As one of Luna's witnesses put it, the device is merely a gross survey tool. All involved agree that the hydrocarbon detector is not the gold standard in accelerant detection. That award seems to go to gas chromatography-mass spectrometry. But the arson investigator acknowledged at trial the device's limitations— including the likelihood of false positives— and identified the hydrocarbon detector as only one factor in labeling the fire "incendiary."

In fact, the Commonwealth's arson investigator relied on a great deal of physical indicators at the scene, wholly outside the results he received from the hydrocarbon detector, to reach his conclusion. During his testimony, the arson investigator looked at the debris, the path traveled by the fire, the lack of significant "fire load"[26] in the area where Hendrickson's body was found, and the severe and localized damage to the floor where Hendrickson's body was found. He acknowledged that the hydrocarbon detector was incapa-

24. Luna claims he was "unable to adequately challenge the reliability of [the arson investigator's] conclusions based on his knowledge and handling of the device and any samples." And, Luna complains that the trial court was unable to "make a ruling on the reliability of the detector device, the particular device at issue, or its actual use in this case." Per Luna's constitutional rights, the lab technicians who handled the samples obtained by the arson investigator from Hendrickson's trailer were required to testify at trial and did so. Any mishandling of those samples or what those results indicate about the arson investigator's chosen methodology does not go to whether the arson investigator should be qualified as an expert; instead, that evidence goes to the weight the jury may afford the arson investigator's testimony.

25. Moreover, there was "substantial evidence" to support the trial court's rejection of Luna's challenge to the arson's investigator. The trial court, accordingly, was not clearly erroneous in making that determination.

26. Essentially the "fuel" of the fire, *i.e.* how much material is available for the fire to consume and grow.

ble of indicating *what* hydrocarbon was detected, but rather, only that a hydrocarbon was present. For him, the device was only used to determine where to gather samples and send to the lab for better testing, *i.e.* gas chromatography-mass spectrometry. Finally, the arson investigator gave a detailed rundown of the steps he goes through in investigating fires.[27] These responses were elicited through both the Commonwealth's direct and Luna's cross-examination. Put simply, allowing the arson investigator to give an opinion as an expert—a status not actually disclosed to the jury—did not substantially sway the jury. We understand that labeling the fire "incendiary" was prejudicial to Luna, especially in light of the fact that no accelerants were ultimately found. But in light of the arson investigator's testimony that acknowledged the limits of the hydrocarbon detector and identified various other reasons for labeling the fire incendiary, coupled with Luna's cross-examination and presentation of witnesses tending to discredit the arson investigator, any *Daubert* error by the trial court was harmless.

## C. Because Hendrickson's Prior Statements Were not Hearsay, They Were Admissible.

■ The Commonwealth sought the admission of various statements made by Hendrickson to others regarding Luna's abusing her and forcing her to participate in various schemes to defraud her insurance company. Luna argued the statements were inadmissible hearsay. Following a pre-trial hearing spanning two days, the trial court allowed the proffered statements to be admitted into evidence at trial, despite Luna's objection. The ground for allowing these hearsay statements into evidence was the little-used exception to hearsay's general rule of exclusion: KRE 804(b)(5), forfeiture-by-wrongdoing.

The various statements the Commonwealth sought to admit were discussed in detail at the two-day hearing on admissibility and are summarized below:

- Janice Level, Hendrickson's sister, testified that Hendrickson informed her of various problems Hendrickson as having with Luna, that he had threatened her, and was just overall abusive to her.

- Bridget Dehart, a friend of Hendrickson's, testified that Hendrickson told her Luna wanted Hendrickson to report the Firebird on her insurance, that Luna forced her to drive him to Illinois at knifepoint, and that Luna assaulted her by pushing her into a coffee table and potted plant.

- Jerry Dehart, a friend of Hendrickson's, testified that Hendrickson told him about Luna pushing her into the coffee table and potted plant. Jerry also testified he worked on Hendrickson's truck once after she told him Luna had driven it, and he found that the fuses had been removed.

- Judy Brown, Hendrickson's friend and co-worker, testified that Hendrickson told her Luna was dangerous and scared her. Hendrickson also told

---

**27.** This rundown is important because part of Luna's argument seems to be a challenge to how the arson investigator worked the scene of the fire with the hydrocarbon detector. More than just a challenge to the reliability of the hydrocarbon detector, Luna is challenging the manner in which the arson investigator used the hydrocarbon detector. Of course, all that is required is that the trial court be presented with enough evidence to make a ruling—with regard to reliability, that is "substantial evidence." Here, given all the information the trial court possessed, we have no trouble finding substantial evidence supporting the trial court's ruling. The arson's investigator's process was calculated to lead to reliable results.

Judy, on the Friday before her death, that she wanted to buy Judy's truck so Luna would stop trying to get her vehicles and just go back to Illinois and leave her alone.

- Progressive Insurance agent Caleb McGrath testified that he initially talked to Hendrickson when she called about pursuing a theft and fire claim on her Pontiac Firebird. The next day, Hendrickson called him crying so much he could barely understand what she was saying. Hendrickson told McGrath that she wanted to come clean—Luna had coached to tell McGrath the car was stolen and to report the claim to Progressive. According to Hendrickson, Luna got her insurance information and reported the claim without her knowing after she told Luna she did not want to lie about the claim.

- Progressive Insurance agent Will Purdue testified that Hendrickson told him Luna told her to tell the police she was driving the Chrysler at the time of the wreck.

- Gary Seiavitch, a Progressive employee, worked on Hendrickson's Chrysler claim. Hendrickson told Seiavitch that Luna had physically abused her and forced her to drive him to Illinois at knifepoint. Seiavitch also testified that Hendrickson showed him a bruise and indicated Luna hit her.

- Deputy Jason Ivey, Marshall County Sheriff's Department, asked Hendrickson about filing charges on the Firebird, which was allegedly stolen and burned. Hendrickson refused and told Deputy Ivey she was scared.

- Officer Kelly Drew testified that he went to Hendrickson's trailer looking for Luna for an unrelated matter. He observed injuries on Hendrickson and asked about how she got them. Hendrickson told him that she had been assaulted by Luna and claimed to have already reported it.

- Deputy Brett Edwards testified that on August 30, 2007, he called Hendrickson to follow up on a previous 911 call by Hendrickson. On the phone, Hendrickson told Edwards that if her trailer were to burn, Luna would be the one who did it. Hendrickson told Edwards Luna had threatened to burn her trailer down and had made threats to kill her and burn her up in the trailer.

- The 911 call that served as the purpose for Edwards's call to Hendrickson was played for the jury. In it, Hendrickson states that while not emergency, she called just in case something happened to her trailer while she was at work the next day.

The general theme of the Commonwealth's evidence was Luna's pursuit of various insurance-fraud schemes in which Hendrickson was at most a reluctant participant. Furthermore, Luna was a convicted felon in Illinois and the terms of his probation prohibited him from leaving Illinois. Yet, Luna came to Kentucky regularly where he was involved in various crimes. Luna involved Hendrickson by coercion— sometimes physical coercion—all the while violating terms of his felony probation. According to the Commonwealth then, Luna faced the possibility of multiple criminal sanctions or initiation of criminal proceedings as a direct result of Hendrickson's reporting him. Despite Luna's coercion, Hendrickson eventually backed out and reported Luna to the authorities, which, perhaps along with Luna's desire to acquire Hendrickson's truck, motivated him to kill her.

In support of this theory, the Commonwealth put on a large amount of proof,

summarized in the following timeline from the trial court's order:

- In 2007, Luna was in the final stages of his involvement in an arson of his residence in Illinois, which occurred in December 2004—the same fire for which Progressive Insurance later obtained a civil judgment against Luna on July 13, 2007. The next day, Luna set fire to his Firebird in Marshall County in order to collect on it from Progressive Insurance.

- Luna proceeded to pursue a claim on the Firebird through Hendrickson, who he was residing with at the time. Luna specifically enlisted her in the effort by having her falsely state to an insurance claims adjustor that she was, in fact, the owner of the Firebird and the car had been stolen from her. Her insurance was Progressive Insurance. Progressive, however, was suspicious and engaged in a closer investigation of the claim.

- During the entire time period of July 2006 through September 7, 2007, when Luna ultimately murdered Hendrickson, Luna was under an order of probation supervision from Franklin County, Illinois. Among other things, the conditions of the order required him to not violate any criminal statutes and to remain within the State of Illinois. Luna did seek an exception for employment in June 2007.

- On July 17, 2007, Luna called Progressive to file a claim that his Firebird had been stolen. On the same day, Hendrickson reported to Progressive that the Firebird had been stolen from her garage the previous weekend.

- On July 18, 2007, Hendrickson, crying and upset, contacted Progressive. She told the agent she was so upset that she could not go to work that day. Hendrickson informed the agent that the Firebird had not been stolen; in fact, Luna had taken it from her home on Saturday, July 14, 2007, and returned the same day without it, claiming the car caught on fire. Hendrickson then told the agent that Luna had coerced her into filing a claim with Progressive by stating she was purchasing the Firebird from Luna. Hendrickson said she did not want to pursue the claim, but Luna had taken her insurance card and reported it. Finally, Hendrickson told the agent that Luna was present while she made the original call to Progressive on July 17, but had left midway through the conversation. In a subsequent call on July 18, Hendrickson informed a Progressive agent that Luna had taken her Chrysler 300M to Illinois and she did not wish to pursue the claim on the Firebird. The notes taken by the agent during the call reflect Hendrickson's fear for her life and recount Hendrickson informing the agent that Luna had physically assaulted her.

- On August 8, 2007, Luna was pulled over in Illinois while driving Hendrickson's Chrysler 300M and charged with driving on a suspended license. As a result, Luna was ordered to appear in court on September 11, 2007; and, based on this charge, the Franklin County (Illinois) prosecutor sought revocation of Luna's felony probation and an arrest warrant on August 28, 2007.

- August 15, 2007: Luna contacted Progressive to pursue the fraudulent claim relating to the Firebird. According to the agent, Luna then put Hendrickson, who was audibly upset and uncontrollably crying, on the phone. Hendrickson told the agent she was uncertain about what to do.

- Luna then stole Hendrickson's Chrysler 300M, wrecked it, and proceeded to enlist her in pursuing a false insurance claim for that damage; specifically, Luna attempted to have Hendrickson inform the insurance company she was driving the car by herself when she wrecked it. Hendrickson went along with this plan at first, but quickly had misgivings and informed both Progressive and the Marshall County. Sheriff's Office that Luna had instructed her to lie. Luna was aware of Hendrickson's disloyalty.

- August 29, 2007: an officer with the Marshall County Sheriff's Office visited Hendrickson's trailer to speak with Luna on an unrelated matter. While there, he observed visible injuries on Hendrickson, which were apparently inflicted by Luna according to Hendrickson. Hendrickson also told the officer Luna had ordered her to vacate her home.

- September 7, 2007: Luna heard Hendrickson tell how Luna had enlisted her in the insurance fraud schemes and that she had turned him into investigators. This was the day of Hendrickson's murder.

The Commonwealth's arrangement of a timeline documenting Luna's activity, both with Hendrickson and without, helped illustrate more clearly the schemes undertaken by Luna and Hendrickson. His partner through it all, Hendrickson was the only individual who could implicate Luna in any of these crimes. It nearly goes without saying that her betrayal would have weighed heavily on Luna.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted.[28] Contrary to the overarching lean toward admission throughout our evidence law, hearsay is generally not admissible unless the statement fits within an exception provided in our rules. Forfeiture-by-wrongdoing is one such exception based upon the timeless concept that an individual should not be permitted to profit or gain from improper conduct.

We have had little opportunity to mold the scope of the forfeiture-by-wrongdoing exception. In *Parker v. Commonwealth*, our most extensive treatment of KRE 804(b)(5) to date, we declared it was "no longer sufficient [ ] simply to show that a defendant caused the declarant's absence; rather, the forfeiture-by-wrongdoing exception to the confrontation clause is applicable 'only when the defendant engaged in conduct *designed* to prevent the witness from testifying.'"[29] And we mandated trial courts to hold an evidentiary hearing before ruling on the admission of hearsay under the forfeiture-by-wrongdoing exception. At such a hearing, the proponent of the evidence bears the burden to show "good reason to believe that the defendant has intentionally procured the absence of the witness, after which the burden then shifts to the opposing party to offer credible evidence to the contrary."[30]

Our decision in *Parker* relied heavily on *Giles v. California*,[31] in which the Supreme Court interpreted the boundaries of the forfeiture-by-wrongdoing exception when dealing with testimonial statements under the confrontation clause. According to the Supreme Court, when dealing with testimonial statements, the proponent of the

---

**28.** *See* KRE 801(c).

**29.** 291 S.W.3d 647, 668 (Ky.2009) (quoting *Giles v. California*, 554 U.S. 353, 359, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008)).

**30.** *Id.* 668–69 (internal quotations omitted).

**31.** 554 U.S. 353, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008).

evidence must prove the defendant intended to prevent the witness from testifying. This, of course, begs the question: what is required for nontestimonial statements?

■ Luna spent much ink attempting to highlight the distinction between nontestimonial and testimonial statements for purposes of the forfeiture-by-wrongdoing exception. In the end, the distinction is of no real importance because of the language of KRE 804(b)(5).[32] Hearsay will only be admissible under the rule if offered "against a party that has engaged in or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."

Recently, Michigan reached this same conclusion because of substantially similar language. In *People v. Burns*, the Michigan Supreme Court held that while "the United States Constitution does not prevent the states from crafting a forfeiture-by-wrongdoing exception for *nontestimonial* hearsay that does not require any proof of a defendant's specific intent[,] but the plain language of our court rule in fact incorporates the specific intent requirement at issue in *Giles*." [33] The *Giles* Court even recognized this point with the federal rule's language: "Every commentator we

are aware of has concluded the requirement of intent [in FRE 804(b)(6) ] means that the exception applies only if the defendant has in mind the particular purpose of making the witness unavailable." [34]

■ Of great importance to our review of the trial court's analysis is the fact that the Commonwealth's burden to establish a basis for application of the exception was a preponderance of the evidence: "evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it." [35] Luna's opposition evidence attempted to highlight holes in the Commonwealth's grand view of Luna's crime, essentially creating reasonable doubt. But reasonable doubt can exist at this portion of the trial.[36] The Commonwealth is not required to disprove all possible alternative theories or doubts that may exist; rather, it is only required to produce enough evidence to outweigh the evidence produced in opposition.

We will grant, though, that the Commonwealth's presentation of evidence does seem to require intent to be inferred from Luna's conduct. In *Parker*, we allowed this inference: "[T]he trial court—and later the jury—could certainly have reason-

---

**32.** In certain situations, the distinction could still carry weight because harmless-error review for constitutional violations, *e.g.* confrontation-clause violation with testimonial evidence, is a step above the general concept of harmless error.

**33.** 494 Mich. 104, 832 N.W.2d 738, 744–45 (2013).

**34.** *Giles*, 554 U.S. at 367, 128 S.Ct. 2678 (internal quotation marks omitted).

**35.** BLACK'S LAW DICT. (6th ed.). A more detailed definition is offered in Black's, 9th edition: "The greater weight of the evidence, not necessarily established by the greater number of witnesses testifying to a fact but by evidence that has the most convincing force;

superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other."

**36.** We note that the Commonwealth's failure to prove this theory of the crime at trial or its reliance on the alternative theory that Luna killed Hendrickson to steal her truck does not affect our determination regarding forfeiture-by-wrongdoing. As we pointed out in *Parker*, "the Commonwealth need [ ] only to satisfy the preponderance of the evidence standard in order for the evidence to be admissible, [therefore] the jury's inability to find Parker guilty beyond a reasonable doubt of killing Stephenson does not alter our analysis[.]" *Parker*, 291 S.W.3d at 670 n.63.

ably inferred from all of the unique facts and circumstances of this case that Parker was motivated to kill Stephenson in order to prevent him from testifying[.]"[37] While we also noted in *Parker* that this inference satisfied the requirements of *Giles*, we must admit that *Giles* is not clear on that point. In fact, the discussion between the majority and dissent in *Giles* seems to pivot on whether intent can be inferred from the defendant's conduct, with the majority requiring evidence of specific intent and the dissent arguing intent can be inferred—so called knowledge-based intent.[38]

■■■ Perhaps this context is where the distinction between testimonial and non-testimonial becomes real. *Giles* and its specific-intent requirement govern only testimonial statements protected by the confrontation clause of the United States Constitution. Our evidentiary rule operates for nontestimonial statements and, as such, could be interpreted to allow an inference of intent. This inference has long been recognized in our law: "Whether a defendant actually has an intent to kill is a subjective matter[, but a] defendant may be presumed to intend the natural and probable consequences of his act[;] and thus a jury is entitled to find an intent to cause death from an act of which death is a natural and probable consequence."[39]

This discussion is largely philosophical in this case, however, because even if we assume that the Commonwealth has not shown the specific intent of murder for the

forfeiture-by-wrongdoing exception, the evidence is admissible because it is *not* hearsay. Indeed, no hearsay exception, forfeiture by wrongdoing or otherwise, is necessary as Hendrickson's statements were not offered for the truth of the matter asserted, *e.g.* whether Luna actually abused her or made her drive him to Illinois at knifepoint. By introducing the statements, the Commonwealth was not seeking to prove Luna actually did abuse Hendrickson. The statements were offered, instead, to paint a picture of why Luna may have been motivated to kill Hendrickson or how he planned to commit insurance fraud. As a result, the statements are less like hearsay and more akin to prior-bad-acts evidence offered for "some other purpose" as allowed under KRE 404(b).

KRE 404(b) operates to exclude "[e]vidence of other crimes, wrongs, or acts" which is admitted in an attempt "to prove the character of a person in order to show action in conformity therewith." It is important to be vigilant with this type of evidence because it can be highly prejudicial, effectively convicting the defendant because of who he is rather than what he is charged with doing.[40] Our rules recognize a narrow set of circumstances where prior-bad-acts evidence is admissible: (1) when offered for "some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident"; or (2) if the prior-bad-acts evidence is "so

---

37. *Parker*, 291 S.W.3d at 670.

38. *Compare Giles*, 554 U.S. at 359, 128 S.Ct. 2678 ("The terms used to define the scope of the forfeiture rule suggest that the exception applied only when the defendant engaged in conduct *designed* to prevent the witness from testifying.") *with Giles*, 554 U.S. at 386, 128 S.Ct. 2678 (Breyer, J., dissenting) ("With a few criminal law exceptions not here relevant, the law holds an individual responsible for

consequences known likely to follow just as if that individual had intended to achieve them.... This principle applies here.").

39. *Smith v. Commonwealth*, 737 S.W.2d 683, 689 (Ky.1987).

40. *See O'Bryan v. Commonwealth*, 634 S.W.2d 153, 156 (Ky.1982).

inextricably intertwined with other evidence essential to the case that the separation of the two [ ] could not be accomplished without serious adverse effect on the offering party." [41]

■■■■ Here, the statements made by Hendrickson prior to her murder were offered for the purpose of motive, preparation, or plan. That does not end our inquiry, however. We must still make the general relevancy and probative-value determinations required of other evidence admitted at trial.[42] The trial court did not make explicit findings on the record, but we find that error to be harmless, to the extent that it is error. First of all, the evidence is certainly relevant—the evidence makes the existence of Luna's mental state and motive, a fact of consequence to the determination of the action more probable than it would have been without the evidence.[43] The question then becomes, under KRE 403, whether the probative value of the evidence is substantially outweighed by the danger of undue prejudice. The simple answer is no. The evidence is, of course, prejudicial to Luna as all evidence of culpability is in a criminal proceeding. The evidence is not, however, *unduly* prejudicial because it is not unnecessary or unreasonable.[44]

■■■ Before both this Court and the trial court, Luna and the Commonwealth have disputed the issue under the forfeiture-by-wrongdoing exception. Neither party has argued Hendrickson's statements were not hearsay. Of course, we can affirm a lower court's decision on any grounds.[45] Luna did not receive a fundamentally unfair trial as a result of the admission of Hendrickson's statements.

## D. Luna's Conduct at the Illinois Police Station was Improperly Admitted.

At trial, the Commonwealth was permitted to introduce the following detailed account of an altercation Luna had with police while awaiting booking after being arrested. While handcuffed, Luna arose from his chair and began approaching a trooper who was seated in front of his computer. Another trooper noticed Luna's advance and yelled, "Get back!" The seated trooper, much to his surprise, turned around to find Luna standing over him. In what can be considered an instinctual reaction, the trooper shoved Luna away from him. Luna lost his balance as a result of the trooper's shove and tumbled backward, striking his head on a nearby bench. As Luna arose from the floor, he was highly agitated and began demanding to be bonded out, going so far as to threaten both the trooper and the trooper's family if he were not bonded out. He was later transported to the hospital where he received four staples in his head to close his wound.

Luna challenges this account as highly prejudicial and irrelevant prior-bad-act evidence under KRE 404(b). Specifically, Luna asserts that the admission of the

---

41. KRE 404(b)(1)-(2).

42. *See* KRE 401–04.

43. KRE 401. Under KRE 404(b), the evidence is relevant for another purpose, *i.e.*, motive, preparation, plan, or knowledge.

44. *See Peacher v. Commonwealth*, 391 S.W.3d 821, 838 (Ky.2013) (citing *Romans v. Commonwealth*, 547 S.W.2d 128 (Ky.1977)).

45. *So. Fin. Life Ins. Co. v. Combs*, 413 S.W.3d 921, 926 (Ky.2013) ("[I]t is well settled that we are not bound by the analysis of the Court of Appeals and may affirm on any grounds supported by the record.") (citing *McCloud v. Commonwealth*, 286 S.W.3d 780, 786 n. 19 (Ky.2009)).

story characterized him as a dangerous and violent person prone to outbursts. The Commonwealth, on the other hand, counters that the evidence cannot be unduly prejudicial because it was admitted at the first trial without objection; and the evidence is not irrelevant because Luna's being combative and aggressive is probative of his guilt. Furthermore, the Commonwealth compares the evidence of Luna's altercation with Illinois police with evidence of flight, which is probative of guilt and admissible. We cannot accept any aspect of the Commonwealth's argument.

■ We have already rejected the Commonwealth's attempt to use the law-of-the-case doctrine so we will not discuss it further. And the Commonwealth's attempt to analogize this altercation to flight is specious. Taken to its conclusion, the Commonwealth's argument would essentially have us support the ridiculous notion that a defendant who flees from a crime into a neighboring state is in "flight" until the moment he is delivered into the hands of Kentucky authorities.

Luna was not on the run when the altercation occurred; instead, he was sitting in an Illinois police station, handcuffed. It is of no import that it was an out-of-state police station and the charged crime occurred in Kentucky. It cannot be argued that a defendant, under arrest, is fleeing from a crime simply because he demands to be released on bail. Moreover, the evidence of the altercation is not inextricably intertwined with the Commonwealth's

other evidence. The Commonwealth desired to introduce the altercation in order to explain why Luna was in the hospital when he made an incriminating statement to police. The details of the altercation, especially the threats made by Luna, are not necessary to provide that context.[46] The trial court abused its discretion in allowing the evidence to be admitted into evidence at trial.[47]

■ But admitting this evidence was harmless error. Luna's statement to police and Luna's own trial testimony included mentions of the police-station altercation, admittedly in less detail. Considering the amount of evidence supporting Luna's role in Hendrickson's murder, we do not believe this prior-bad-acts evidence substantially swayed the jury to convict Luna of first-degree murder or first-degree arson.

### E. The Commonwealth's Cross–Examination of Luna was Improper but not Reversible Error.

■ In our 2010 opinion, we held that the mention of various fires in Luna's past was erroneous because there was no evidence indicating that Luna was responsible for the fires. Specifically, we held the mention of three previous fires at Luna's residence in Illinois was erroneous. However, we did allow evidence of Luna's garage and car fire because they were relevant to prove motive and knowledge of how to start a fire. At the instant trial, during cross-examination the Commonwealth asked Luna about these past fires.

---

46. Generally speaking, we have repeatedly noted that evidence of prior threats or violence against some third party is the type of inadmissible character evidence KRE 404(b) seeks to avoid. *See Driver v. Commonwealth,* 361 S.W.3d 877, 886–87 (Ky.2012); *Davis v. Commonwealth,* 147 S.W.3d 709, 722 (Ky. 2004).

47. *Bell v. Commonwealth,* 875 S.W.2d 882, 889–91 (Ky.1994), outlines the three-pronged test trial courts must conduct in reviewing KRE 404(b) evidence. Trial courts must evaluate the proposed evidence in terms of: (1) relevance; (2) probativeness; and (3) its prejudicial effect. This evidence fails that test.

During cross-examination of Luna, the Commonwealth asked Luna about three fires that occurred at Luna's former residence in Illinois. In addition, the Commonwealth asked Luna about an apartment fire that occurred in the early 90s. That fire occurred at Luna's building but Luna denied having anything to do with it. Likewise, Luna denied having anything to do with the previous fires at his home, with the exception of a fire in his garage, which he admitted to starting accidentally with a cigar after spilling some gasoline. Luna did acknowledge receiving insurance proceeds from the previous fires. The Commonwealth did not present any evidence Luna was responsible for the fires.

With regard to this issue, the record of the present trial presents two key facts that are different from the trial record we faced in 2010: (1) the Commonwealth did not call Robert Davis as a witness in the retrial; and (2) Luna took the witness stand in the retrial and testified on his own behalf. The former is noteworthy because Davis is the witness through which the Commonwealth introduced the Illinois fires we held to be erroneously admitted. The latter is noteworthy because Luna was given the opportunity to present his side of the story about not only what happened that fateful night, but also his history and his relationship with Hendrickson. But

those differences aside, the fact remains that in our 2010 opinion we said unequivocally that the Illinois fires were irrelevant because the Commonwealth could not present sufficient evidence to allow the jury to conclude reasonably that Luna was responsible for them.[48]

That we are now dealing with the same Illinois fires [49] we previously held were inadmissible under KRE 404(b) is astounding. The Commonwealth is right in one—and only one—regard: our holding in 2010 did not prohibit the Commonwealth from cross-examining Luna on retrial or from mentioning the word "fire." But the Commonwealth appears to believe that the only problem with the Illinois-fire evidence was that it was admitted in the first trial through Davis and that by not calling him on retrial any error is somehow eliminated.[50]

 The Commonwealth's arguments miss the point entirely. It was not simply the *manner* in which the Illinois-fire evidence was admitted, but the *content*.[51] Indeed, KRE 404(b) is not designed to police *how* evidence is admitted, but rather what that evidence says about the defendant. Whether it is admitted through cross-examination or through Robert Davis, this evidence is inadmissible under KRE 404(b) because the evidence is insufficient for a jury to conclude reasonably that Luna set

48. *Luna v. Commonwealth*, 2010 WL 4683564 at *9 (No. 2008–SC–000652–MR Nov. 18, 2010).

49. By "Illinois fires," we refer to three previous fires involving one of Luna's prior residences.

50. The trial court noted that it would remain vigilant and our 2010 opinion did not prohibit the evidence if the Commonwealth could present more evidence regarding Luna's participation in the fires. This is a correct characterization of the 2010 opinion. The problem is, the Commonwealth introduced no additional evidence to show Luna set these prior fires.

51. Regardless of how the evidence was admitted at Luna's original trial, this point we made in 2010 rings true: "[I]n the case at bar, the only evidence connecting Luna to the prior trailer and house fires in Illinois was that the fires occurred on his property. Accordingly, it was error to allow evidence of these two prior fires to be admitted in this trial." *Luna*, 2010 WL 4683564 at *9. Clearly, it was not the manner in which the evidence came in, but *the evidence itself* that was problematic.

the past fires. We were clear, so we thought, in 2010 that the Commonwealth needed to introduce more evidence relating to Luna's involvement in past fires. In a truly remarkable response to our directive, the Commonwealth has actually introduced *less*. Because of this, the evidence remains inadmissible and should not have been allowed.

Luna's counsel made no timely objection during the Commonwealth's questioning of Luna, with the exception of a single instance in response to the Commonwealth's comment about the apparent irony of Luna formerly living on Coal Street in Illinois. Following that objection, the Commonwealth withdrew the question and Luna did not request a jury admonition.[52] As a result, Luna relies primarily on a pre-trial objection for preservation of the admission of the prior-bad-acts evidence at trial.

We have recently observed that pre-trial objections are sufficient to preserve an issue for appellate review.[53] And our evidence rules mandate this view: "A motion in limine resolved by order of record is sufficient to preserve error for appellate review."[54] Here, the Commonwealth presented notice of its intent to introduce prior-bad-acts evidence and Luna filed an objection. The basis for Luna's objection was essentially what we held in 2010—the Commonwealth's evidence linking Luna to the prior fires was insufficient. In its initial order, the trial court ruled the evidence admissible after appropriately going through the *Bell*[55] test

and weighing the probativeness, relevancy, and prejudice of the evidence. Luna then filed a motion seeking reconsideration of the order and requesting more specific findings of fact. This subsequent order, in all candor, raises a degree of confusion regarding whether Luna's allegation of error is properly preserved. The trial court essentially delayed ruling on the admission of the proposed evidence, noting that "this issue, like the rest of the issues before the court, will ultimately be determined at trial based upon the evidence presented." Going further, the trial court held:

> The court's ruling on January 20, 2012 does not give the Commonwealth a free hand presenting its case with no constraints. The ruling simply puts defendant on notice that if the Commonwealth meets its burden based on the Supreme Court's opinion from the first trial, it may then introduce evidence of the trailer and house fires. The prior ruling of the Supreme Court said the Commonwealth failed to meet its burden in the first case, but that does not serve to prohibit the Commonwealth from seeking to meet that burden in this trial. As for the court making specific findings, the court will do its job at the trial. The court does not believe defendant is entitled to such at this point.

The trial court's reasoning unnecessarily engenders confusion because it. is not readily apparent if the trial court has truly resolved a motion in limine with an order of record as required by KRE 103(d). Rather, it seems the trial court has only postponed resolution of the motion. In

52. "Failing to request an admonition is generally regarded as trial strategy, and therefore waives the issue on appeal." *Sullivan v. Commonwealth*, 2008 WL 4691944 (No. 2006–SC–000930–TG Oct. 23, 2008) (citing *Ernst v. Commonwealth*, 160 S.W.3d 744, 759 (Ky.2005); *Hall v. Commonwealth*, 817 S.W.2d 228, 229 (Ky.1991)).

53. *See, e.g., Lanham v. Commonwealth*, 171 S.W.3d 14, 19–23 (Ky.2005).

54. KRE 103(d).

55. *Bell*, 875 S.W.2d at 882.

light of our procedural and evidentiary rules this action makes little sense.

It is certainly within a court's discretion, pending the introduction of more evidence, to delay ruling on a motion. That said, the delay of a ruling until the middle of trial is problematic and should be discouraged. As this case illustrates, it is difficult to link the prior bad acts to a party without essentially disclosing the prior bad acts. In nearly all material aspects, a delayed ruling becomes no ruling. Here, the trial court forbade the Commonwealth from introducing "evidence of the trailer and house fires" without first meeting its burden, which, of course, begs the question: how does the Commonwealth meet its burden without introducing some evidence of the trailer and house fires? It seems to us difficult to link a defendant to a prior bad act without mentioning the prior bad act.

Best practice, in our opinion, dictates that a trial court conduct a hearing and make an affirmative ruling *before* trial.[56] The proponent of prior-bad-act evidence under KRE 404(b) should be prepared to present sufficient evidence at the hearing to allow a jury to conclude reasonably that the opposing party—defendant, here—was the actor. A delayed ruling in this instance does little to promote the purpose of KRE 404(b), KRE 103(d), or motions in limine in general. Of course, if new evidence comes to light after the trial court's ruling, a party may always request a trial court reconsider its ruling in light of the new evidence. This accomplishes the

same objective the trial court sought here, but does so within the procedural framework we have built to protect parties' rights.

An objection at trial would have made preservation more clear, of course, but its absence is not fatal in this particular instance. In any event, whether we consider Luna's s pre-trial objection sufficiently preserved for appellate review is largely immaterial because the error is harmless for a several reasons. At most, the prior-bad-act evidence indicated that Luna had the knowledge necessary to start fires. But, Luna repeatedly denied association with the fires and gave reasonable explanations for his lack of participation. Evidence of Luna's fire knowledge was not overly prejudicial given Luna's admission that he did start the fire in his garage. The evidence at issue here, moreover, pertained primarily, if not solely, to Luna's first-degree arson charge—a charge which we resolve in Luna's favor later in this opinion. Mentioning previous fires has little, if anything, to do with murdering Hendrickson by striking her in the head with a blunt object.

Given the totality of the evidence indicating Luna's guilt and the short period of questioning at issue, we do not find the Commonwealth's cross-examination affected the judgment or the trial's underlying fairness to a degree warranting reversal.

## F. The Illinois Civil Judgment Against Luna was Properly Admitted.

Luna next challenges as error the trial court's decision to allow the Common-

---

**56.** We should note that Luna's counsel is unable to avoid a degree of blame in this scenario. The propriety of the trial court's order aside, Luna's counsel should have, in the very least, insisted upon a ruling from the trial court upon reading the trial court's apparent indication it would reserve its ruling until trial. It nearly goes without saying, but, as a practical matter, it is essential to obtain a ruling on a motion. This piece of wisdom is even more apparent when the ruling is ambiguous or unclear, as it was here. The ruling was not ambiguous, however, as a signal for Luna's counsel to be alert at trial. Luna's counsel, instead, sat idle as the evidence he had fought to exclude was repeatedly referenced before the jury.

wealth's introduction of a civil judgment against Luna. The judgment, obtained by Progressive Insurance, stemmed from a prior fire at Luna's residence in Illinois. Progressive paid under the policy shortly after the fire, but later filed a civil action against Luna and his then-fiancee. Eventually, on July 13, 2007, Progressive obtained a judgment for $11,527.72 because the insured parties were not entitled to coverage because of a misrepresentation during the policy application. The misrepresentation was made by Luna's then-fiancee. The date of the judgment is important because it is the day before Luna's Firebird burned, for which Luna fraudulently attempted to recover insurance proceeds.

Luna's singular focus on the fact that he was not responsible for the misconduct that led to the civil judgment is misguided. Liability is not why the judgment is relevant. The judgment is relevant for what it orders, and, more specifically, the financial implications of what it orders. Simply put, the judgment placed a financial burden on Luna. And we have acknowledged in various contexts that "the state of [a defendant's] finances is relevant to whether he had a motive" [57] to commit the crime for which he is charged. That holds true with Luna. The judgment and its associated financial burden bolster Luna and Hendrickson's insurance-fraud scheme, which we have already discussed in detail as being relevant to Luna's motive for murder.

Luna challenges the judgment's relevance by arguing that he did not receive a copy of the judgment until discovery during trial for Hendrickson's murder, so he could not have burned the Firebird with that judgment debt in mind. That may be true, but Luna's purported lack of knowledge does not affect the admissibility of the judgment. Instead, the possibility that Luna may not have known of the judgment goes to the weight the jury may decide to afford the judgment during its deliberation. Furthermore, the entry of the judgment did not serve to mislead the jury as Luna argues. The insurance fraud scheme, while complex at times, was a central point in the Commonwealth's theory. Rarely will evidence directly pertaining to the central point of a theory in issue at trial mislead the jury. The opposite will virtually always be true. This case does not present one of those rare situations. There was no error in the trial court's admission of the judgment.

## G. Luna was Improperly Asked to Characterize the Testimony of Other Witnesses, but this Error was Harmless.

During cross-examination, the Commonwealth asked Luna a series of questions revolving around whether Luna believed the other witnesses at trial were lying. Luna argues he was deprived of a fair trial because of this line of questioning. We agree that the questioning was improper, to a degree, but find any associated error to be harmless to the extent it drew an objection. Of course, we do not find the error to be palpable.

We have consistently recognized as improper questioning that asks the witness to characterize another witness's ostensibly divergent testimony as being untruthful.[58] "Such a characterization places the witness in such an unflattering light as to potentially undermine his entire testimo-

57. *Emerson v. Commonwealth*, 230 S.W.3d 563, 570 (Ky.2007); *see also Adkins v. Commonwealth*, 96 S.W.3d 779, 793 (Ky.2003).

58. *See, e.g., Moss v. Commonwealth*, 949 S.W.2d 579, 583 (Ky.1997).

ny." [59] Because of the Commonwealth's mode of questioning here, it bears emphasizing again that "[c]ounsel should be sufficiently articulate to show the jury where the testimony of the witnesses differ without resort to blunt force." [60] Admittedly, we have not yet found such a characterization to rise to palpable error under our RCr 10.26.

At trial, the following exchange between the Commonwealth and Luna took place:

Luna: I went to hand her the phone, and Deb was upset about the fact that her car had just been wrecked and about the fact that you know I was— my leg was infected and I was going to have to go, or had gone to the doctor, going to have to go.

Commonwealth: Go on. You can go on.

Luna: Oh, I'm done.

Commonwealth: So, she's uncontrollable, she's crying, she's sobbing, you put her—

Luna: No, she wasn't uncontrollable, but, he writes that in his notes that it was, he can tell that story if he wants.

Commonwealth: All right, well, between Caleb McGrath and the guy who's on trial for murder, I think the guy on trial for murder has an incentive to kind of bend things his way, would you agree with that?

Luna: Um, shoot. Ill tell you maybe Caleb McGrath

has a reason, he's a Progressive agent, I've had problems with Progressive they—

Commonwealth: It's amazing.

Luna: Maybe they have a biased opinion, maybe there's some bias—

Commonwealth: It's amazing.

Luna: As a matter of fact, in his policy they said they had a previous policy with me, with Progressive, which is the one that I was sued over, so he did know about this—

Commonwealth: Right, you're—

Luna: So—

Commonwealth: You're a suspicious person because you keep filing fraudulent claims with Progressive, it's a reasonable assumption.

Luna: I've never filed a fraudulent claim with Progressive.

Commonwealth: You filed a claim on the shed fire after lying on their policy.

Luna: I never lied on anything. I never—you have the paperwork, you know—

Commonwealth: Marcia lied, everybody lies, everybody is lying but you.

Luna: Yeah, well you know I didn't speak with people. You have the paper—

Commonwealth: Is everybody lying but you?

Luna: I don't know what everybody's doing.

Commonwealth: The Deharts, Bobby Davis, these officers, Detective Hilbrecht, everybody coming in this courtroom—

At this point, the defense roused to offer an objection to the questioning. The Commonwealth argued at the ensuing bench conference that Luna had opened the door to this line of questioning by testifying that Caleb McGrath was lying when he stated, "he can tell that story if he wants." The trial court agreed and overruled the objection. Following the objection, the Commonwealth asked Luna: "So, everybody, all of these witnesses, I mean we

59. *Id.*

60. *Id.*

have had over I don't even know how many witnesses, over thirty witnesses, came in here and testified about their experience with you, and poor Deb Hendrickson. And every one of them is out to get you? Is that right?" Luna replied, "That's your story."

We consider it fairly debatable whether Luna's testimony that Caleb McGrath was telling a "story" constituted a comment on another witness's veracity. But the defense failed to object in a timely fashion, rendering the issue unpreserved—at least the majority of the issue. Although we are troubled by the Commonwealth's conduct of the cross-examination of Luna and cannot emphasize enough that blunt force is never an acceptable trial strategy, the error does not rise to the level of palpable, as we recognized in *Moss*.

The Commonwealth's questioning did not create a palpable error. In fact, the error was harmless in light of Luna's testimony. Having reviewed the trial, we believe there is not a "substantial possibility that the result would have been any different" [61] if the Commonwealth's questioning as to the other witnesses' testimony would not have occurred. On cross-examination, Luna was a combative witness and repeatedly retorted an iteration of "that's your story" to questions from the Commonwealth rather than providing a substantive answer and repeatedly battled with the Commonwealth. Essentially, Luna challenged the majority of the Commonwealth's questions as inaccurate, false, or simply theoretical. The general prohibition outlined in *Moss* of this type of

questioning was designed to prevent a witness from being presented in an unflattering light from which he could not recover in the eyes of the jury. But, where a defendant places himself in an unflattering light with an overall combative tone, the impact of such questioning by the Commonwealth is somewhat mitigated. It becomes difficult to say with any reliability whether the Commonwealth's questioning or the defendant's own recalcitrance contributed to the jury's verdict.[62] Accordingly, we conclude that the Commonwealth's conduct of the cross-examination, while improper, was not palpably erroneous. The Commonwealth's questioning can be considered harmless in this context. Nor did the Commonwealth's questioning "so infect[ ] the trial with unfairness as to make [Luna's] conviction a denial of due process." [63]

## H. The Trial Court Properly Rejected Luna's Alleged Alternative Perpetrator Theory.

Before trial, Luna filed a motion requesting permission to present evidence in support of an alleged alternate perpetrator (aaltperp). The trial court denied Luna's motion, but Luna preserved the issue by offering avowal testimony. Luna now asserts the trial court erroneously denied his motion and denied his right to present a complete defense. We disagree.

Ingrained in both our law and recognized concepts of fundamental fairness is a defendant's "right to introduce evidence that another person committed the offense with which he is charged." [64]

**61.** *Commonwealth v. McIntosh*, 646 S.W.2d 43, 45 (Ky.1983).

**62.** Though unpublished, we noted this difficulty in *Stratton v. Commonwealth*, 2007 WL 188998 (No.2005–SC–000307 Ky. Jan 25.2007). On appeal for habeas, our decision in *Stratton* was affirmed by the Eastern District of Kentucky. *Stratton v. Hall*, 2010 WL

5922110, Civil No. 10–107–KKC–CJS (E.D.Ky. Dec. 28, 2010).

**63.** *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

**64.** *Beaty v. Commonwealth*, 125 S.W.3d 196, 207 (Ky.2003) (quoting *Eldred v. Commonwealth*, 906 S.W.2d 694, 705 (Ky.1994)).

So important is this right that a trial court may only interfere with it if the defense's aaltperp theory is "unsupported, speculative, and far-fetched[, which] could thereby confuse or mislead the jury."[65] To be sure, the ability to present an aaltperp theory of the crime is a critical tool in the defense toolbox. But it is not so important that any mention of an aaltperp is sufficient to allow the evidence to come before the jury. As we have stated, "evidence is not automatically admissible simply because it tends to show that someone else committed the offense."[66] The possibility of confusing or misleading the jury is very real and must be closely monitored by the trial court.

■■■ To strike the balance between the defendant's rights and presenting evidence in a manner in which the jury can digest, we have consistently demanded that, at the very least, opportunity *and* motive should be shown before evidence of an aaltperp theory comes before the jury.[67] And that is the problem with the aaltperp evidence proffered by Luna. There was no substantive evidence indicating both opportunity and motive. Instead, Luna sought to admit evidence that one of Hendrickson's former boyfriends committed the crime. Hendrickson's relationship with this boyfriend ended a few months before Luna moved in with her. According to the evidence, the former boyfriend physically

abused Hendrickson and even threatened her life at one point. Luna's evidence tends to create more questions than answers. "In a homicide case, a defendant is not entitled to parade before the jury every person who bore some dislike for the victim[,]"[68] and that is all Luna did here. The trial court appropriately exercised its discretion in denying Luna's aaltperp theory.[69]

## I. Luna did not Present Sufficient Evidence to Warrant an Intoxication or Extreme Emotional Disturbance Instruction.

Throughout this trial, we acknowledge the common thread of alcohol consumption. According to the evidence conflict coincided with alcohol consumption. In light of that, Luna now argues the trial court erroneously denied his request for an intoxication instruction. And considering Luna's account of the struggle between him and Hendrickson before the fire, no doubt alcohol-fueled, Luna requested an extreme-emotional-disturbance instruction. The trial court denied that request as well, and Luna now challenges that denial as error.[70]

■■■ As an initial matter, "[a] trial court is required to instruct on every theory of the case reasonably deducible from the evidence."[71] The trial court, in other words, has a duty to instruct on the whole

65. *Id.* (internal quotation marks and alteration omitted).

66. *Id.*

67. *See Hedgepath v. Commonwealth,* 441 S.W.3d 119, 132 (Ky.2014) (citing *Beaty,* 125 S.W.3d at 208).

68. *Beaty,* 125 S.W.3d at 208.

69. We should note that Luna alleged other individuals may have committed the crime. The evidence linking these individuals—"Phillip" and the unknown man Hendrickson met

in Paducah—was even more tenuous than the evidence relating to Hendrickson's ex-boyfriend. We reject any notion that an aaltperp defense was warranted on the basis of these individuals as well.

70. Both allegations of error are properly preserved by Luna. As such, we review under an abuse-of-discretion standard.

71. *Manning v. Commonwealth,* 23 S.W.3d 610, 614 (Ky.2000).

law; that is, law "applicable to every state of the case covered by the indictment and deducible from or supported to any extent by the testimony." [72] With regard to an affirmative instruction, however, as voluntary intoxication and extreme emotional disturbance are, "some evidence justifying a reasonable inference of the existence of a defense" [73] must be introduced. An affirmative instruction must be rejected if the evidence does not warrant it.

▆▆▆ Dealing with Luna's intoxication request first, KRS 501.080(1) states voluntary intoxication is only a defense if the intoxication "[n]egatives the existence of an element of the offense." Of course, in the instant case, Luna seeks a voluntary intoxication instruction to negate the intent element of both first-degree murder and first-degree arson. Luna argues the jury could have reasonably believed he was too intoxicated to form the requisite intent and, accordingly, he was entitled to instructions for lesser charges. [74]

▆▆▆ Our case law requires more than mere evidence of alcohol consumption. Instead, a voluntary intoxication instruction is appropriate "where there is evidence reasonably sufficient to prove that the defendant was so drunk that he did not know what he was doing." [75] Simple drunkenness is not sufficient; instead,

a "more advanced degree of drunkenness" [76] is required.

Luna's characterization of the events leading to Hendrickson's murder presents no evidence he was so drunk that he did not know what he was doing. The evidence certainly indicates that Luna consumed an impressive amount of alcohol on the night in question; indeed, his blood alcohol content hours after Hendrickson's murder was .209. To be sure, that reading was taken after Luna finished off a bottle of liquor when unable to find Hendrickson's pulse and continued to drink alcohol during his getaway to Illinois; and, more importantly, it indicates little with regard to Luna's level of intoxication at the time of the murder. Luna offers no evidence of blacking out or otherwise succumbing to alcohol in a manner that makes him seem unaware of his conduct. [77] The evidence points to the contrary, in fact. At trial, Luna provided a detailed account of the events leading up to Hendrickson's murder and the alleged physical clash between him and Hendrickson. That account, discussed below, did not indicate intoxication to the point of negating an intentional mental state. To the contrary, Luna appeared in control of his mental faculties. Even though his testimony was filled with comments that he was drunk, we reiterate that without evidence of a more advanced

**72.** *Callison v. Commonwealth,* 706 S.W.2d 434, 437 (Ky.1986) (quoting *Lee v. Commonwealth,* 329 S.W.2d 57, 60 (Ky.1959)) (alteration and emphasis omitted).

**73.** *Fredline v. Commonwealth,* 241 S.W.3d 793, 798 (Ky.2007) (quoting *Grimes v. McAnulty,* 957 S.W.2d 223, 226 (Ky.1997)).

**74.** The trial court instructed the jury on lesser charges for both arson and murder.

**75.** *Harris v. Commonwealth,* 313 S.W.3d 40, 50 (Ky.2010) (internal quotation marks omitted).

**76.** *Foster v. Commonwealth,* 827 S.W.2d 670, 677 (Ky.1991).

**77.** *See, e.g., ·Colyer v. Commonwealth,* 2009 WL 736001 (No. 2007–SC–000195–MR March 19, 2009) ("Appellant's testimony that he drank heavily and used drugs on the day of the assault alone would not entitle him to an intoxication instruction if not for his testimony that he blacked out during the commission of the assaults.").

drunkenness, a voluntary intoxication instruction is not warranted.

■■■■ Similarly, Luna's attempt to obtain an extreme-emotional-disturbance instruction is not warranted based on the evidence. To prove adequately extreme emotional disturbance, a defendant must offer evidence that he "suffered a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from an impelling force of the extreme emotional disturbance rather than from evil or malicious purposes."[78] Extreme emotional disturbance may have its roots in the common law concept of heat of passion, but it long ago outgrew the stricture of that historic principle. Our jurisprudence now recognizes that "it is possible for *any event, or even words,* to arouse extreme mental or emotional disturbance."[79] While what constitutes the triggering event may be broadly construed, its impact on the defendant is not. The event must be so dramatic as to render the mind temporarily uncontrollable and provoke "an explosion of violence."[80]

In short, Luna presents no evidence indicating an explosion of violence as a result of some triggering event. The absence of any indication Luna was temporarily unable to control his conduct is also fatal to Luna's argument. The narrative Luna presented at trial may have supported a self-defense theory, but it certainly did not support extreme emotional disturbance:

> Hendrickson became upset when Luna refused to go along with her plan to burn the trailer down. She then stabbed him in the leg with a paring

knife, after which Luna retreated to the bathroom, applied a bandage to the wound, and changed jeans. The stabbing was just the beginning, though. When Luna exited the bathroom, Hendrickson had been looking through his cell phone and was now enraged over what she found. Hendrickson struck Luna in the face, bloodying his nose, and grabbed him by the hair. Luna was able to get free and returned to the bathroom to clean up blood yet again. Luna then heard Hendrickson yelling she would burn the place down and the click of a lighter. Hendrickson lit candles, wrapped them in an afghan, and dumped vodka all around. *This* is when she snapped. Hendrickson retrieved a handgun and attempted to fire at Luna, but the gun did not fire. Luna went toward her and they struggled over the gun—boom!—nothing but ringing in Luna's ears. All Luna could think of "was not being with [his] kids, [and] them growing up without their dad." As he continued to struggle with Hendrickson, Luna grabbed a nearby whiskey bottle Hendrickson had thrown at him earlier. She rose up, yelling "I'm going to kill you!" The gun went off again. Luna swung the whiskey bottle and connected with the back of Hendrickson's skull. She collapsed to the floor, motionless.

At no point in Luna's narrative does he describe his own temporary state of mind so enraged, inflamed, or disturbed as to overcome his judgment. In fact, Luna did not seem enraged, inflamed, or disturbed at all. If anything, he had complete control over his judgment as he

---

78. *Greene v. Commonwealth,* 197 S.W.3d 76, 81 (Ky.2006) (quoting *McClellan v. Commonwealth,* 715 S.W.2d 464, 468–69 (Ky.1986)) (alteration and internal quotation marks omitted).

79. *Spears v. Commonwealth,* 30 S.W.3d 152, 155 (Ky.2000).

80. *Baze v. Commonwealth,* 965 S.W.2d 817, 823 (Ky.1997).

notes all he could think of was dying and his children growing up fatherless. To prevent this outcome, Luna makes a decision, visceral perhaps, to fight back and get Hendrickson off of him and calmed down. In no way does this fall within the scope of extreme emotional disturbance. Accordingly, Luna did not present sufficient evidence to warrant an instruction on extreme emotional distress. The trial court did not abuse its discretion.

Finally, the defense Luna offered at trial seemingly undercuts an intoxication or extreme emotional disturbance instruction being warranted. As Luna's narrative illustrates, his primary, if not sole, theory of defense was self-defense, *i.e.* hitting Hendrickson with the whiskey bottle was justified because he feared for his life. That is consistent with his mind becoming filled with thoughts of his children and dying. If anything, Luna acted with intention in protecting his life. He did not lose his mind because of some dramatic event and he was not so drunk that he did not know what he was doing. Luna's testimony indicates, rather, he knew exactly what he was doing.

**J. Luna was Entitled to a Directed Verdict on the First–Degree Arson Charge.**

▪ To be convicted of first-degree arson, codified in KRS 513.020, a person must start a fire or cause an explosion with "intent to destroy or damage a building" and the building must be "inhabited or occupied or the person has reason to believe the building may be inhabited or occupied" or "[a]ny other person sustains serious physical injury as a result of the fire or explosion or the firefighters as a result thereof."

Luna's argument is simple: Hendrickson was dead from blunt force trauma to the head before the fire started, so Luna cannot be convicted of first-degree arson because Hendrickson was not "occupying" the trailer. The Commonwealth, in return, argues the evidence as to whether Hendrickson was dead before the fire or, perhaps more accurately, whether Luna had reason to believe she was dead is inconclusive, rendering a directed verdict inappropriate. Considering the evidence offered at trial, we must agree with Luna.

▪ Our standard and method of review regarding a motion for directed verdict is deeply rooted and well understood. At trial, the court "must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given."[81] In making this determination, the trial court "must assume that the evidence for the Commonwealth is true, but reserv[e] to the jury questions as to the credibility and weight to be given such testimony."[82] On appellate review, however, a defendant is only entitled to a directed verdict "if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt[.]"[83] Faced with a directed-verdict motion, the Commonwealth must produce "more than a mere scintilla of evidence"[84] to satisfy its burden.

Not a single witness offered any testimony at trial to suggest that Hendrickson was alive at the time of the fire. The

81. *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991).

82. *Id.*

83. *Id.*

84. *Id.*

Marshall County Coroner testified that he noticed compression skull fractures—different from heat fractures caused by fire—almost immediately upon entering the burned-out trailer. At the scene, he surmised the cause of Hendrickson's death was blunt-force trauma to the head. The medical examiner that performed the autopsy bolstered that conclusion. Hendrickson's body had several indicators of blunt-force trauma: skull fractures, subdural hemorrhaging, and bruises to the brain away from the location of the skull fractures.[85] There was no disagreement in the evidence that blunt-force trauma, not fire, caused Hendrickson's death. More importantly, though, the autopsy revealed a notable absence of soot deposition in Hendrickson's airways. The medical examiner testified unequivocally: there was no evidence Hendrickson was breathing when the fire was in close proximity for her to be breathing in smoke.

On this point, even if we assume the Commonwealth's evidence to be true and draw all fair and reasonable inferences in the Commonwealth's favor, we are constrained to reach the same conclusion: Hendrickson was dead before the fire. And the primary witnesses to prove that point were the Commonwealth's own witnesses. Luna's testimony was consistent with the findings of the coroner and medi-

cal examiner. He checked Hendrickson's pulse several times, both at her neck and at her wrist, and was unable to find a pulse. The Commonwealth disputes this aspect of Luna's testimony and attempts to diminish it by placing *find* in scare quotes. This evidence is important because it would seem axiomatic that in order for an individual to be considered occupying a building for purposes of first-degree arson, that individual must be alive.

Finally, the Commonwealth argues that the evidence is inconclusive because the exact time of the fire is unknown, so while Hendrickson may have been dead before the fire was around her, she may have been alive at the start of the fire. Luna testified that Hendrickson lit some candles and wrapped them in an afghan before they engaged in their violent struggle, obviously indicating that Hendrickson was alive at the start of *a* fire. Whether that fire grew to become *the* fire is unknown.[86] In support of this argument, the Commonwealth directs our focus to *Bray v. Commonwealth*,[87] an arson case involving inconclusive evidence and rejecting the defendant's directed-verdict motion.

■■■ The problem with the Commonwealth's position is that it has the burden of proof.[88] To be sure, the fire's timeline

---

85. According to the medical examiner, the location of the bruises was consistent with being struck in the skull with significant force while the head was free to move, *i.e.* Hendrickson was not lying on the floor when struck. After being struck, physics takes over and the head continues to move as a result of the strike's force. Eventually the head's motion comes to an abrupt end; the brain, however, continues its movement until encountering the skull. This is why the bruises to the brain are *away* from the skull fractures—the force was to the back right side and the bruises were in the front of the brain.

86. Of note on this point, the Commonwealth's arson investigator discredited Luna's testimony that the candles wrapped up in the afghan could have been the ignition source for a fire of this magnitude. According to the arson investigator, candles in that situation would most likely have burned in a small area and burned out because they ran out of fuel, causing localized damage rather than the conflagration that engulfed the home.

87. 68 S.W.3d 375 (Ky.2002).

88. It is axiomatic that "the burden is on the government in a criminal case to prove every element of the charged offense beyond a rea-

is ambiguous, and, as can be typical with homicide cases, perhaps the only person who could provide insight into that timeline is the victim. But it is the Commonwealth's burden to produce evidence indicating Hendrickson was alive at the start of the fire and Luna set the fire aware of that fact. And the Commonwealth has produced no evidence to shed light on when the fire was started, not even a scintilla.

Perhaps highlighting the Commonwealth's lack of evidence, the jury convicted Luna of first-degree arson but did not find that Hendrickson's murder was committed during the commission of first-degree arson, the ostensible hand-in-glove statutory aggravator given the charges. For these reasons, Luna was entitled to a directed verdict on the first-degree arson charge.

This directed verdict does not, however, alter Luna's sentence because the jury recommended a sentence of life imprisonment without benefit of probation or parole not for first-degree arson, but for first-degree murder committed in the commission of first-degree robbery. The jury recommended twenty years' imprisonment for the first-degree arson conviction, to be served consecutively with the life imprisonment sentence. Clearly then, a directed verdict on first-degree arson has no impact on Luna's life imprisonment sentence.

### K. Luna's Trial was not Unfair Because of Cumulative Error.

Even if we find all the errors argued above by Luna to be harmless, Luna contends he is entitled to a new trial because

the errors, when combined, render his trial unfair. The doctrine of cumulative error has been cautiously applied by this Court, reserving it only for situations "where the individual errors were themselves substantial, bordering, at least, on the prejudicial." [89] But, "[w]here as in this case, ..., none of the errors individually raised any real question of prejudice, we have declined to hold that the absence of prejudice plus the absence of prejudice somehow adds up to prejudice." [90] While we must say that Luna's trial was not error-free, at the same time, we cannot say any of the errors, "either individually or cumulatively, render the trial unfair." [91] Consequently, we reject Luna's cumulative-error argument.

### L. The Commonwealth did not Exhibit Prosecutorial Vindictiveness by Seeking Statutory Aggravators in Luna's Second Trial.

Luna next contends that the Commonwealth exhibited prosecutorial vindictiveness by seeking statutory aggravators on remand when statutory aggravators were not sought for the first trial. This decision, according to Luna, effectively punished him for exercising his constitutional rights and appealing his conviction. We disagree.

The United States Supreme Court first recognized prosecutorial vindictiveness under the broad concept of due process in *North Carolina v. Pearce*.[92] In *Pearce*, the Court held that if a judge imposes a more severe sentence on a defendant after winning a new trial, "the reasons for his

sonable doubt and that the failure to do so is an error of Constitutional magnitude." *Miller v. Commonwealth*, 77 S.W.3d 566, 576 (Ky.2002).

**89.** *Brown*, 313 S.W.3d at 631.

**90.** *Id.*

**91.** *Id.*

**92.** 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).

doing so must affirmatively appear" and "be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding." [93] It is worth mentioning that *Pearce* involved sentencing by a judge. The *Pearce* holding was later narrowed in both *Alabama v. Smith* [94] and *Blackledge v. Perry*.[95] In *Blackledge*, the Court held that a defendant's right to due process is "not offended by all possibilities of increased punishment upon retrial after appeal, but only by those that pose a realistic likelihood of vindictiveness." [96]

 Generally speaking, there exist two methods through which prosecutorial vindictiveness may be shown: actual and presumptive. "Actual vindictiveness" requires "objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal rights." [97] Luna does not argue that the Commonwealth acted with actual vindictiveness, but rather presumptive. In those situations where objective evidence of vindictiveness is lacking, as here, prosecutorial vindictiveness can be presumed depending on the apparent likelihood of vindictiveness. "Given the severity of such a presumption, however—which may operate in the absence of any proof of an improper motive and thus may block a legitimate response to criminal conduct—the court has done so only in

cases in which a reasonable likelihood of vindictiveness exists." [98]

We do not find the current situation to present a reasonable likelihood of vindictiveness. No doubt, the prosecution has a sizable stake in obtaining a conviction and appropriately punitive sentence. But, the circumstances presented here do not indicate any reason for this Court to presume vindictiveness. First of all, the prosecution was different for Luna's first trial and the trial at issue. A special prosecutor from the Attorney General's office tried the case on remand. Looking at the case with fresh eyes and having the advantage of a prior trial, more time to review the record and prepare for the matter, the prosecutor in the retrial chose to proceed with statutory aggravators. The Commonwealth alleges that statutory aggravators were not sought in the first trial because of time restraints.[99] Luna filed a series of motions for continuance before the instant trial because his representation was in flux. Given the extra time, the Commonwealth decided to seek a conviction on statutory aggravators. Based on some statements by the Commonwealth before trial, Luna attempts to weave a conspiracy theory by arguing that the Commonwealth punished Luna for seeking the continuances and winning on appeal. The evidence does not support this argument, at least not to a degree that warrants a presumption of vindictiveness.

93. *Id.* at 726, 89 S.Ct. 2072.

94. 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989).

95. 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974).

96. *Id.* at 27, 94 S.Ct. 2098 (internal quotation marks omitted).

97. *United States v. Poole*, 407 F.3d 767, 774 (6th Cir.2005) (quoting *United States v. Dupree*, 323 F.3d 480, 489 (6th Cir.2003)).

98. *Commonwealth v. Leap*, 179 S.W.3d 809, 813 (Ky.2005) (quoting *United States v. Goodwin*, 457 U.S. 368, 373, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982)).

99. It is worth pointing out that statutory aggravators must be proven beyond a reasonable doubt so may require more time than is readily apparent.

Second, the Commonwealth did make the choice to pursue statutory aggravators, but did not make the choice to convict on them. As the Supreme Court of Mississippi noted:

> Each aggravating circumstance had to be proven beyond reasonable doubt, and the jury was required to weigh the aggravating circumstances against the mitigating circumstances. The jury was not informed as to the long rocky road of Jordan's trials, retrials and resentencings. Therefore, any possible prosecutorial vindictiveness that Owen had as the result of Jordan's obtaining yet another resentencing was rendered impotent because it was the jury which decided that Jordan should be sentenced to death rather than life imprisonment without parole. The statutory safeguards in place in capital cases assured that the jury operated without the taint of prosecutorial vindictiveness.[100]

And as the Supreme Court has pointed out: "The potential for such abuse of the sentencing process by the jury is, we think, [de minimis] in a properly controlled retrial."[101] The distinction between judge sentencing and jury sentencing is an important one. Statutory aggravators have been a possibility in this action from the time Luna was indicted. The Commonwealth exercised its discretion in the first trial and did not pursue aggravators; but, on remand, counsel and deadlines changed, giving the Commonwealth both new perspective and more time to prepare its case. At bottom, though, Luna was indicted for a capital crime and was tried for a capital crime both times.

We see little evidence of vindictiveness in the Commonwealth's conduct on remand.

### M. Luna was not Entitled to a Directed Verdict on the Robbery Aggravator.

■ Finally, Luna contends the Commonwealth did not present sufficient evidence to convict Luna of murdering Hendrickson in the commission of first-degree robbery. The evidence presented, according to Luna, required impermissible inferences built upon inferences for the jury to convict. We admit the evidence is was not overwhelming, but we disagree with Luna that the Commonwealth failed to satisfy its burden for the charge to reach the jury. The issue is unpreserved, and Luna requests we engage in palpable error review; but we find no error of any kind.

The Commonwealth introduced various pieces of evidence highlighting Luna's need to acquire Hendrickson's truck. Primarily, Luna's employment dictated a method of transportation was critical. Luna testified that he drove to nearly all of his jobs, but did fly to some, depending, of course, on the jobs' locations. The nature of his trade was such that he needed to be mobile so that he could respond quickly to the demands of the market, essentially going where the work was.

A friend of Hendrickson's testified that Hendrickson wanted to buy her truck so that Luna would stop trying to get her vehicles. Luna seizes on this bit of testimony, alleging it demands the jury pile inference on top of inference. This allegation is centered on the fact Hendrickson's friend used the word "vehicles" in her testimony instead of "truck." According to Luna, the jury was then forced to infer that Hendrickson meant "truck."

■ We recently detailed our inference-on-inference jurisprudence in *South-*

---

**100.** *Jordan v. State,* 786 So.2d 987, 1001–02 (Miss.2001).

**101.** *Chaffin v. Stynchcombe,* 412 U.S. 17, 26, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973).

*worth v. Commonwealth.*[102] Our rule barring a string of inferences is not absolute, "despite being stated in absolute terms. If that were the case, then the exercise of logic, which frequently employs inference-derived inferences, would not.be allowed to the jury."[103] Instead, our rule is "intended to condemn inferences that build upon inferences in *an unreasonable manner.*"[104] Luna is unable to direct our attention to any *unreasonable* strings of inferences. Yes, Hendrickson's friend did say "vehicles" instead of "truck," but, considering the evidence presented at trial that the Firebird was burned by Luna and Hendrickson's Chrysler was wrecked by Luna, it is certainly not unreasonable for the jury to infer "vehicles" included "truck." Notably, no evidence was put forth that Hendrickson owned more vehicles than the Chrysler 300M and the truck.

When we assume the Commonwealth's evidence to be true and view the evidence in a light most favorable to the Commonwealth, it is clear more than a mere scintilla of evidence was presented. There was no error, palpable or otherwise.

## III. CONCLUSION.

The Commonwealth failed to present sufficient evidence indicating Hendrickson was alive, thereby occupying the trailer, before the start of the fire. Luna's first-degree arson conviction, consequently, is reversed. Finding no error requiring reversal of the judgment, we affirm Luna's first-degree murder conviction, however. Luna's sentence for first-degree murder committed during the commission of first-degree robbery, life imprisonment without possibility of parole or probation, is likewise affirmed. This matter is remanded to the trial court for entry of a new judgment consistent with this opinion.

Minton, C.J.; Abramson, Cunningham, Keller, Noble, and Venters, JJ., sitting. All concur.