# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.



# Supreme Court of Kentucky

2018-SC-000236-MR

LLOYD W. HAMMOND      APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.      HONORABLE AUDRA JEAN ECKERLE, JUDGE
NO. 16-CR-001169

COMMONWEALTH OF KENTUCKY      APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

A Jefferson Circuit Court jury convicted Lloyd W. Hammond of wanton murder, facilitation to murder, first-degree burglary, first-degree unlawful imprisonment, and retaliating against a participant in the legal process. Sentenced to sixty-five years in prison, Hammond now appeals to this Court as a matter of right. Finding no error, we affirm Hammond's conviction.

### FACTS AND PROCEDURAL HISTORY

On June 3, 2006, intruders entered the home of Troya Sheckles, where they murdered William Sawyers. Police gathered evidence identifying Lloyd Hammond and Terrell Cherry as the perpetrators of the burglary and murder. Two witnesses identified Hammond as one of the perpetrators: Shaheed Al-Uqdah, who later testified he accompanied Hammond on June 3 but remained

in the car and Troya Sheckles, Sawyers's girlfriend, who did not initially identify Hammond as one of the perpetrators but accused him after seeing his image on a television report about the crime. Evidence also indicated that shortly after the Sheckles burglary and Sawyers murder, Hammond murdered Cherry to keep him from testifying about the crimes. Hammond was eventually charged with the murders of both Sawyers and Cherry, as well as the other crimes that occurred during the Sheckles burglary. Two weeks after Cherry was murdered, Kerry Williams was killed while standing on his porch talking to visitors. Hammond was identified as the gunman and indicted for that murder as well.[1]

Prior to trial, the Commonwealth moved to dismiss all charges without prejudice because Sheckles, the only remaining eyewitness to the Sawyers murder, could not be located. Sheckles was later found and sworn to reappear, and Hammond was reindicted. On March 29, 2009, before the case could be brought to trial, Sheckles was shot and killed as she sat in a park near her home. Prior to her death, Sheckles met with investigators and gave recorded statements describing the circumstances of Sawyers' death and the burglary. The first trial ended in a mistrial when a potential juror disrupted the proceedings. Over Hammond's objection, the trial court rescheduled the case for trial and consolidated it with the Williams murder case.

---

[1] Although initially included in the same indictment as the Sawyers and Cherry murders, as well as the other crimes associated with the Sheckles burglary, the Williams murder charge was severed and is not included in the present appeal.

A joint trial on all charges was held in 2010, and the Commonwealth introduced audio recordings of Sheckles's statements to police. Ordinarily, Sheckles's out-of-court statements would be inadmissible as hearsay and their admission would violate Hammond's Sixth Amendment right of confrontation under *Crawford v. Washington,* 541 U.S. 36, 62 (2004). However, the Commonwealth claimed that Hammond acquiesced to Sheckles's murder to prevent her from testifying and therefore her statements were admissible under the forfeiture-by-wrongdoing exception to the hearsay rule. Kentucky Rule of Evidence (KRE) 804(b)(5). The trial court admitted the statements.

Al-Uqdah also testified at the 2010 trial after having entered a plea agreement in December 2007.[2] In the agreement, Al-Uqdah admitted he had facilitated the killing of Cherry and agreed to a five-year prison sentence.[3] In his trial testimony, Al-Uqdah claimed he had ridden in the back seat of a vehicle as Hammond and Cherry talked about plans to steal drugs from and kill Sawyers. He testified that Hammond and Cherry went inside Sheckles's house while he waited in the car and that when the men returned, Hammond claimed that he had shot Sawyers. Al-Uqdah further testified that he was with Hammond when Hammond shot Cherry. At the 2010 trial, Hammond was convicted of three counts of murder, first-degree burglary, first-degree unlawful

---

[2] Al-Uqdah was initially charged with Cherry's murder in 2006, but his plea agreement dropped the pending murder charge. During Al-Uqdah's 2010 trial testimony, he acknowledged that Hammond made statements implicating him in the Cherry murder.

[3] An additional year was added to Al-Uqdah's sentence after he violently attacked two jailers.

imprisonment, and retaliating against a witness in the legal process. The trial court sentenced him to life without parole.

Hammond appealed and this Court reversed his conviction. *Hammond v. Commonwealth*, 366 S.W.3d 425 (Ky. 2012). We held that joinder of the Williams murder with the Sawyers and Cherry murders and other charges was improper because the Williams murder was not connected to the other crimes as part of a common scheme or plan and was not of the same or similar character as the other crimes charged.[4]

This Court further held that the trial court erred in admitting Sheckles's out-of-court statements to police. The trial court's findings on the admissibility of the evidence were based solely on an eighty-four-page set of unauthenticated documents tendered by the Commonwealth without any evidentiary foundation, and therefore were not supported by substantial evidence. 366 S.W.3d at 432 (citing *Young v. Commonwealth*, 50 S.W.3d 148, 167 (Ky. 2001)). More specifically, the Commonwealth failed to connect the assortment of facts and circumstances that comprised its theory of Hammond's role in the Sheckles murder to the documents it produced. As noted, this Court reversed Hammond's convictions and remanded the case for a new trial.

---

[4] Kentucky Rule of Criminal Procedure (RCr) 9.12 provides that two or more indictments may be tried together if the offenses could have been joined in a single indictment. Under RCr 6.18, separate offenses may be joined in a single indictment when they are "of the same or similar character," or are "based on the same acts or transactions connected together or constituting parts of a common scheme or plan." This Court determined that Hammond was prejudiced by the joinder of all charges. 366 S.W.3d at 428-31.

Before retrial, the trial court held an evidentiary hearing on April 29, 2013 and May 1, 2013, as to the admissibility of Sheckles's statements. The Commonwealth called the lead detectives on the Sheckles and Sawyers murders who testified about information learned through various witness interviews. Additionally, the Commonwealth introduced its prior motion to dismiss based on Sheckles's unavailability and the hearing in which Sheckles was sworn to reappear, as well as Hammond's jail visitor logs. Following the evidentiary hearing, the trial court held that the Commonwealth had not met its burden of proof and denied the motion. The trial court noted that all the information "solidly" supported admitting Sheckles's statements, but concluded that it was confined by this Court's 2012 opinion to deny admission, essentially finding that despite the evidentiary hearing, it had nothing more to consider than it had before the first trial.

After the trial court's ruling, the Commonwealth moved to dismiss the case and filed an interlocutory appeal. The Court of Appeals reversed the trial court's decision, holding that the trial court's evidentiary hearing provided sufficient grounds to admit the statements under KRE 804(b)(5) because the evidence was properly authenticated and defense counsel had the opportunity to cross-examine the officers. After the Court of Appeals determined that Sheckles's statements were admissible in future proceedings, Hammond filed a motion for discretionary review, which this Court denied.

On May 3, 2016, Hammond was indicted—for the third time—for the murders of Sawyers and Cherry, for unlawfully restraining Sheckles while he

burglarized her home, and for retaliating against a potential witness, Cherry. This indictment occurred after a nearly ten-year period during which there were related trials and appeals regarding the murder of Troya Sheckles.[5]

During a January 2017 pretrial hearing in this case, the parties discussed Al-Uqdah's availability and competency to testify as a witness. His attorney informed the court that he was in custody on unrelated charges and that his competency was being evaluated. The trial court granted Hammond access to Al-Uqdah's mental health records. Before the 2018 trial began, the Louisville Metro Police Department (LMPD) made numerous attempts to locate Al-Uqdah but were unsuccessful. On January 31, 2018, during trial the Commonwealth made a motion to admit Al-Uqdah's previous 2010 trial testimony on the grounds he was unavailable as a witness pursuant to KRE 804(a)(5).

Ultimately, the jury saw the video of Al-Uqdah's previous trial testimony and heard Sheckles's recorded statements to police. After six hours of deliberation, the jury returned verdicts finding Hammond guilty of the wanton murder of Sawyers, facilitation to the Cherry murder, first-degree burglary, first-degree unlawful imprisonment, and retaliating against a participant in the legal process for murdering Cherry. Hammond was sentenced to sixty-five

---

[5] Dejuan Hammond and Steven Pettway were convicted of the murder of Troya Sheckles. In opinions affirming their murder convictions, this Court noted that the evidence at trial was that the men killed Sheckles to keep her from testifying against Lloyd Hammond, Dejuan's brother, regarding the murder of William Sawyers. *Pettway v. Commonwealth*, 470 S.W.3d 706 (Ky. 2015); *Hammond v. Commonwealth*, 2016 WL 3371054 (Ky. 2016).

years in prison, and now appeals as a matter of right challenging the admission of Al-Uqdah's prior testimony and Sheckles's statements to police. Additional facts relevant to the issues raised are discussed below.

## ANALYSIS

### I.  The trial court did not abuse its discretion in admitting the prior trial testimony of Al-Uqdah.

Over Hammond's objection, the trial court allowed the jury to watch the video of Al-Uqdah's testimony from the 2010 trial, in which Al-Uqdah identified Hammond as the person who murdered Sawyers and Cherry. Hammond argues that the trial court abused its discretion in holding that the Commonwealth had made sufficient efforts to secure the attendance of its critical witness, Al-Uqdah, *i.e.*, the good faith efforts necessary to establish that he was "unavailable" to testify at trial so that his prior testimony could be admitted pursuant to KRE 804(a)(5). Specifically, Hammond argues that his Confrontation Clause rights were violated when the trial court admitted Al-Uqdah's recorded testimony.

Prior to trial, the trial court issued a Warrant for Arrest of a Disobedient Witness for Al-Uqdah pursuant to Kentucky Revised Statute (KRS) 421.130. That warrant was communicated to the LMPD and was then placed in ewarrants, an electronic database for warrants used by law enforcement officers. The trial court noted that it was not aware of any other circuit court ever issuing an ewarrant for a disobedient witness's arrest, nor had the trial court itself ever done so.

7

The trial court also stated that it would allow Hammond an opportunity to present proof or cross-examine witnesses to establish that it was the Commonwealth's burden to procure Al-Uqdah's presence, and that the jail had Al-Uqdah in custody on previous occasions and released him despite the ewarrant. Finally, Hammond would also be allowed to present evidence of Al-Uqdah's mental health issues to the jury.[6]

Hammond argues that the Commonwealth's attempts to locate Al-Uqdah were insufficient to justify the deprivation of his right to confront Al-Uqdah as a witness. The Confrontation Clause of the Sixth Amendment of the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The trial court is vested with discretion regarding the admission of evidence and its decision to admit evidence will not be disturbed absent an abuse of discretion. *Matthews v. Commonwealth*, 163 S.W.3d 11, 19 (Ky. 2005). Hammond maintains the trial court misapplied KRE 804(a) and therefore abused its discretion.

KRE 804(a) provides that the "[u]navailability of a witness includes situations in which the declarant: . . . (5) [i]s absent from the hearing and the proponent of the statement has been unable to procure the declarant's attendance by process or other reasonable means." Under KRE 804(b)(1), a

---

[6] As noted, in an earlier proceeding over a year before trial, Hammond was allowed access to Al-Uqdah's mental health records.

witness's former testimony given at another hearing is admissible if the witness is unavailable. The rule states that:

> [t]estimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

The proponent of the prior testimony must "have made a good faith effort to obtain the witness's presence at trial." *Parson v. Commonwealth*, 144 S.W.3d 775, 783 (Ky. 2004). In this regard, the assessment of the Commonwealth's efforts "is a matter committed to the sound discretion of the trial judge," and the decision "will not be reversed unless it is clearly unreasonable." *Lovett v. Commonwealth*, 103 S.W.3d 72, 83 (Ky. 2003).

During an evidentiary hearing on January 31, 2018, after Hammond's trial had begun, LMPD Detective Peters testified regarding the efforts to locate Al-Uqdah. Previously, the detective served Al-Uqdah with a subpoena while he was at a local hospital but Al-Uqdah did not appear on the original trial date. He also did not appear for a hearing on November 21, 2017, despite having been served with a subpoena by the defense on September 21. Although he was not the lead detective on the case since its inception in 2006, Detective Peters had worked on the case since 2016. He outlined the efforts LMPD had taken to locate Al-Uqdah, including: (1) going to his last known residence several times including on January 29, 2018, before trial testimony began; (2) contacting two family members who the detective once spoke with at the

9

residence; (3) making other officers in his unit aware of the arrest warrant; (4) searching other areas in Louisville including a White Castle that Al-Uqdah often visited; (5) messaging his partner before the January 31, 2018 hearing asking him to search for Al-Uqdah at an intersection he frequents; and (6) going to a location provided by the defense in search of Al-Uqdah on the night before the January 31, 2018 hearing.

Hammond did not present any proof or call any witnesses at the mid-trial hearing. Having found that the Commonwealth made a sufficient showing that the police had taken the necessary efforts to locate Al-Uqdah and being satisfied that he was unavailable, the trial court granted the Commonwealth's motion to play the video of Al-Uqdah's previous trial testimony. In its ruling, the trial court noted that the Commonwealth is not required to make a showing that the police undertook every possible effort and deployed every officer to attempt to locate Al-Uqdah.

In support of his argument that the trial court abused its discretion, Hammond cites *Cook v. McKune,* 323 F.3d 825, 832 (10th Cir. 2003), in which the Tenth Circuit Court of Appeals noted that using a transcript of prior testimony rather than live testimony results in a defendant losing the chance to have the factfinder view a witness's demeanor.[7] But in this case the jury was

---

[7] We note that the *Cook* case predates the United States Supreme Court's opinion in *Crawford,* 541 U.S. 36, which held that out-of-court testimony by witnesses is barred under the Confrontation Clause unless the witness is unavailable, and the defendant had a prior opportunity to cross-examine him. The *Crawford* decision rejected a "general reliability" exception delineated in *Ohio v. Roberts,* 448 U.S. 56, 66 (1980), which provided that when a declarant is unavailable, his statement is admissible if it shows an adequate "indicia of reliability." Although the *Cook* decision

10

able to watch the recorded sworn testimony from the prior trial, and while perhaps not as valuable as live testimony, the recorded testimony still allowed the jurors in the present case to assess the witness's demeanor in a courtroom setting. *Parson*, 144 S.W.3d at 783. Al-Uqdah also had to face Hammond as he testified in the 2010 trial, whereas in *Cook* the prior testimony was simply a transcript from a preliminary hearing. With these important factual differences noted, we turn to the four relevant criteria *Cook* outlines for assessing the reasonableness of a prosecutor's efforts to secure a witness:

> First, the more crucial the witness, the greater the effort required to secure his attendance.

> Second, the more serious the crime for which the defendant is being tried, the greater the effort the government should put forth to produce the witness at trial.

> Third, where a witness has special reason to favor the prosecution, such as an immunity arrangement in exchange for cooperation, the defendant's interest in confronting the witness is stronger.

> Fourth, a good measure of reasonableness is to require the State to make the same sort of effort to locate and secure the witness for trial that it would have made if it did not have the prior testimony available.

*Cook*, 323 F.3d at 835-36 (citations omitted). Hammond argues that all four factors weigh against the trial court's ruling in his case. While we agree with Hammond that the four factors, as applied, establish the importance of Al-

---

predates *Crawford*, *Cook*'s discussion of "[t]he lengths to which the prosecution must go to produce a witness . . ." is unaffected and still pertinent. *Cook*, 323 F.3d at 835.

11

Uqdah as a witness and the great effort required by the Commonwealth, we believe the Commonwealth met its burden.

Here, as outlined above, the Commonwealth and LMPD made good faith efforts to secure Al-Uqdah's presence. Clearly, Al-Uqdah was a crucial witness for the Commonwealth, and Hammond was being accused of serious crimes. Additionally, Al-Uqdah entered a plea agreement with the Commonwealth in exchange for his testimony, which makes Hammond's interest in confronting the witness stronger. That plea agreement led to a five-year sentence, which Al-Uqdah had completed at the time of trial, and thus, as Hammond points out in his brief, Al-Uqdah, arguably, no longer had a special reason to favor the prosecution. While Hammond had a strong interest in confronting Al-Uqdah, that opportunity was available to him during the 2010 trial, at which time he was cross-examined for forty-five minutes.

During the evidentiary hearing, Hammond's counsel alleged that if Al-Uqdah testified live at the 2018 trial he, hypothetically, could have more effectively cross-examined him than previous counsel at the 2010 trial. Hammond's 2018 counsel acknowledged that he personally knew Hammond's two prior counsel to be effective lawyers, but that if given the opportunity, he would have employed different strategies. He noted that prior counsel had not impeached Al-Uqdah on a series of critical issues, including material contradictions between different parts of his testimony and evidence that he was mentally unstable.

12

After reviewing the testimony, the trial court determined that the 2010 cross-examination of Al-Uqdah sufficiently exercised Hammond's confrontation rights, and we agree. In 2010, defense counsel engaged in a forty-five minute cross-examination, which elicited information about Al-Uqdah's mental health and introduced information about the plea agreement he accepted. In its order admitting the prior testimony, the trial court described the 2010 cross-examination as "rigorous and thorough" and emphasized that it was conducted by "competent defense counsel." We agree. It is immaterial that Hammond's present counsel may have conducted a different cross-examination.

In sum, despite the importance of Al-Uqdah's testimony, the Commonwealth satisfied its burden of making a good faith effort to secure Al-Uqdah's presence at trial. Therefore, the trial court did not abuse its discretion in admitting his former trial testimony. We reiterate that a trial court's decision to admit prior testimony of an unavailable witness pursuant to KRE 804(a)(5) "will not be reversed unless it is clearly unreasonable," *Lovett*, 103 S.W.3d at 83, and that standard is simply not met here.

## II.     The trial court did not err in admitting Sheckles's prior statements.

Prior to Hammond's first trial in 2010, the Commonwealth asked the trial court to admit Troya Sheckles's recorded statements to police into evidence, contending that Hammond had acquiesced in her March 2009 killing and, being responsible for her unavailability at trial, had forfeited his Confrontation Clause rights by his own wrongdoing. The trial court recognized that Sheckles's statements were hearsay and, as such, presumptively inadmissible.

13

However, KRE 804(b)(5) provides that the hearsay rule does not apply to "a statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."

To support its theory that Hammond procured Sheckles's unavailability as a witness, the Commonwealth presented the trial court with an eighty-four-page set of documents pertaining to the police investigation of the Sheckles murder.[8] Hammond argued that the hearsay statements were inadmissible under KRE 804(b)(5) without an evidentiary hearing, and that the stack of documents provided by the Commonwealth could not be considered "evidence" without a proper foundation.

Despite this objection, the trial court held that Sheckles's statements were admissible under the forfeiture-by-wrongdoing exception. KRE 804(b)(5). The trial court reasoned that the investigative reports submitted by the Commonwealth fostered reasonable inferences that Sheckles was killed to prevent her from testifying against Hammond and that this was done "at the behest of, or at the very least, the acquiescence of Hammond." As noted, Hammond's first trial ended in his conviction but this Court reversed. *Hammond*, 366 S.W.3d 425.

---

[8] The documents, which had been provided to defense counsel in advance, included copies of the 911 log; the statement of the first responders to the shooting; transcripts of police interviews with witnesses to the Sheckles shooting; a log from the jail showing times for Hammond's visits with his brother, Dejuan; an aerial photo of the crime scene; autopsy records; and the arrest reports of the alleged shooter. *Hammond*, 366 S.W.3d at 431 n.4. These documents are not available for review on this appeal.

This Court reversed the conviction based on the improper joinder of the Williams murder with the Sawyers and Cherry murders and other crimes, and because of the admission of Sheckles's statements. We held that the trial court's findings regarding the forfeiture-by-wrongdoing exception were based on the unauthenticated documents tendered by the Commonwealth, and thus were not supported by substantial evidence. According to this Court's opinion, no formal evidentiary hearing was held, and no live witnesses testified to establish the verity of these documents.[9] Further, the Commonwealth failed to "connect the assortment of facts and circumstances that comprise its theory of Appellant's role in Sheckles's murder to the specific documents where those facts are established." *Id.* at 433. This Court summarized:

> Upon retrial, the Commonwealth bears the burden of proving forfeiture by wrongdoing and we trust that if the issue arises upon remand, the Commonwealth will properly establish at a *Parker* hearing the authenticity and reliability of the documents upon which it relies, and that the evidentiary hearing will be conducted so as to provide an adequate record of the evidence for appellate review. If upon retrial, the forfeiture by wrongdoing standards as discussed herein are met, Sheckles's statement would be admissible in the Sawyers and Cherry proceeding.

*Id.* at 434 (citing *Parker v. Commonwealth*, 291 S.W.3d 647 (Ky. 2009)).

On remand, the trial court conducted an evidentiary hearing and both parties briefed the admissibility issue. The trial court determined that it was in "the unfortunate position of having the same information it already possessed

---

[9] On remand, the trial court conducted a hearing and noted that although the Supreme Court opinion stated there was no prior hearing, there had been multiple hearings. Regardless of whether an evidentiary hearing was held prior to this Court's 2012 opinion, that hearing is not available in this record for review.

15

when it made its prior ruling. That information solidly supports allowing [Sheckles's] testimony." Circuit Ct. Op. and Order, 4, May 24, 2013. Nevertheless, the trial court determined that it could not reissue the same opinion based on the same evidence presented before, noting that "[t]he Kentucky Supreme Court surely did not send this case back for a new trial solely to allow two detectives to read to the Court the same interview summaries the Court had already read." *Id.* at 5. Having concluded that the Commonwealth failed to provide additional evidence, the trial court denied the motion to introduce Sheckles's prior statements. Despite still believing strongly that the statements should be admitted pursuant to KRE 804(b)(5), the trial court was apparently reluctant to reiterate its prior holding.

After the trial court denied admission of the statements, the Commonwealth dismissed all charges against Hammond and successfully challenged the trial court's ruling in the Court of Appeals. Finding that the Commonwealth properly authenticated the police reports and witness interviews, the Court of Appeals determined that the trial court followed this Court's directive by holding a hearing and subsequently finding that the evidence introduced supported admitting the statements. The Court of Appeals recognized that at the evidentiary hearing Hammond had the opportunity to impeach or rebut the authenticity of the Commonwealth's evidence, an opportunity he did not have earlier. Accordingly, the appellate court reversed the trial court's decision and remanded the case with instructions to allow the

introduction of Sheckles's statements. Hammond then filed a motion for discretionary review in this Court, which was denied.

As noted, the Commonwealth reindicted Hammond in May 2016 for the murders of Sawyers and Cherry, as well as for burglary, unlawful imprisonment, and retaliating against a participant in the legal process. The parties understood that because of the Court of Appeals' opinion, Sheckles's recorded statements were admissible, and those statements to police were played for the jury over Hammond's continuing objection.

Hammond now argues that the Court of Appeals wrongly held that authentication alone is sufficient to qualify police records as "substantial evidence" capable of establishing the elements of the forfeiture-by-wrongdoing hearsay exception.[10] Hammond insists that the Commonwealth was also required to demonstrate that the authenticated records were reliable.

As a preliminary matter, the Commonwealth argues that the Court of Appeals' decision on this issue is the law of the case and thus further review is precluded. "'Law of the case' refers to a handful of related rules giving substance to the general principle that a court addressing later phases of a lawsuit should not reopen questions decided *by that court or by a higher court* during earlier phases of the litigation." *Brown v. Commonwealth*, 313 S.W.3d 577, 610 (Ky. 2010) (emphasis added). "It is fundamental that when an issue

---

[10] Hammond also alleges that the Court of Appeals did not undertake independent review of the evidentiary record, but records indicate that three volumes of record were transmitted to the Court of Appeals.

17

is finally determined by an appellate court, the trial court must comply with such determination." *Williamson v. Commonwealth*, 767 S.W.2d 323, 325 (Ky. 1989). While the admissibility of Sheckles's statements became "law of the case" for the trial court on remand from the Court of Appeals, the doctrine does not apply to this Court in this appeal.

When this Court denies a motion for discretionary review, the law of the case doctrine does not bind the Court during later review. Kentucky Rule of Civil Procedure (CR) 76.20(9)(a) states that "[t]he denial of a motion for discretionary review does not indicate approval of the opinion or order sought to be reviewed and shall not be cited as connoting such approval." Although Hammond sought discretionary review of the Court of Appeals' decision as to Sheckles's statements, review was denied. This denial does not equate to this Court deciding the admissibility issue.

"Where multiple appeals occur in the course of litigation, another law-of-the-case rule provides that issues decided in earlier appeals should not be revisited in subsequent ones." *Brown*, 313 S.W.3d at 610. In our prior opinion, this Court addressed the admissibility of Sheckles's statements when there had been no evidentiary hearing and no authentication of any evidence, but subsequent to our 2012 opinion, the trial court held an evidentiary hearing and the evidence supporting admission was properly authenticated. Thus, while the KRE 804(b)(5) issue was previously before this Court, it was in a different context. Additionally, given that this appeal stems from a new

18

indictment and new trial, the issue is properly before this Court for review on the merits.[11]

While the law of the case doctrine is inapplicable, the admissibility of Sheckles's prior statements has already been addressed generally by this Court and a clear directive issued to the trial court, a directive which we believe was followed. In our 2012 opinion, this Court held that

> Without a stipulation by [Hammond], it was incumbent upon the Commonwealth to establish that the documents submitted to the trial court were, in fact, what they were purported to be and that the information upon which it relied to make its case was credible. Ordinarily, that would be done by witness testimony, presumably the police investigator who prepared the documents or was otherwise sufficiently apprised of their creation and content, and competent as a witness to authenticate them and answer questions posed by the court or the opposing party. Without even some rudimentary authentication of the documents, the opposing party has no reasonable means to challenge the veracity of the contents of documents and *the trial court cannot reasonably accept the documents as evidence worthy of its consideration.* We do not say that in all cases this requirement can only be satisfied by the testimony of a live witness. But, we do say that *until some manner of accreditation was provided to cloak the information contained in the documents with even a modicum of reliability, the eighty-four-page stack of papers did not become "evidence," and findings drawn from it cannot be regarded as being supported by "substantial evidence."* It is simply not enough to presume the contents of the documents are reliable because they were gathered by the police investigating a homicide.

*Hammond*, 366 S.W.3d at 433 (emphasis added).

---

[11] Prior to this trial, Hammond filed a motion to exclude the statements, which was denied, and he objected to the admission of the statements immediately before the recordings were played for the jury. Therefore, this issue is properly preserved for review.

19

The trial court record on remand and the associated supporting documents are not before this Court on appeal because that case was dismissed when the Commonwealth sought interlocutory appeal of the trial court's order denying admissibility of Sheckles's statements. As noted, Hammond was subsequently reindicted, so the trial court record begins in May 2016. However, the parties supplemented the record in this case with a recording of the 2013 evidentiary hearing.

The trial court conducted a nearly two-and-a-half-hour hearing regarding Sheckles's unavailability and allowed the parties to brief the issue after the hearing. Throughout the entirety of Hammond's cases, the Commonwealth's theory has been that Hammond acquiesced to the killing of Sheckles because she witnessed the Sawyers murder. The Commonwealth theorized that Dejuan Hammond had Steven Pettway, a juvenile at the time, kill Sheckles to prevent her trial testimony and thereby help Hammond. During the 2013 evidentiary hearing, the Commonwealth introduced a video of a hearing in which an attorney testified that Dejuan Hammond was present in the courtroom the day Sheckles was sworn to reappear to testify at Lloyd Hammond's trial. It also introduced a certified jail visitor log that documented Hammond's visitors while he was incarcerated.

Additionally, the Commonwealth called two detectives who were lead detectives in the Sheckles and Sawyers murder investigations. The detectives read excerpts from investigative reports they prepared after interviewing multiple witnesses. Some of the information elicited from these investigative

reports was: (1) a witness told police that she overheard conversations between Dejuan and Hammond in which they discussed "handling" a situation and Dejuan assured his brother he would "handle it" two weeks prior to Sheckles's murder; (2) a witness told police she overheard a conversation between Dejuan and Pettway in which Pettway told Dejuan they needed to "hurry up and get it done" — the murder occurred an hour later; (3) Sheckles's mother told police that members of Hammond's family blamed Sheckles for Hammond being in jail; (4) a witness heard Dejuan say Sheckles was "taken care of" a few days after the murder; (5) a witness told police Dejuan and Pettway hid a gun in her backyard and collected it a few days before the murder; (7) a witness stated Pettway admitted to killing Sheckles; (8) a witness stated Pettway killed Sheckles for Dejuan, who had been taking care of Pettway and promised to continue taking care of him and his family; (9) an inmate housed with Hammond told police that Hammond said Sheckles was killed and his family did it, that he had a girl "knocked off" and that his family would not let him spend the rest of his life in prison.

Hammond's argument to the trial court primarily focused on the unreliability of Sheckles's identification of Hammond throughout her discussions with police.[12] Hammond also produced self-authenticated court records pertaining to some of the witnesses identified in the police investigative

---

[12] In her initial discussions with police, Sheckles did not pick Hammond out of a photo pack but she readily identified Cherry as one of the men who entered her home. It was not until later, when she was watching news reports of the Cherry murder, that she identified Hammond as one of the perpetrators.

21

reports, and indicated that if the witnesses themselves had testified, he would have confronted them with their court records to impeach their credibility.[13]

The record on this appeal contains the trial court's original May 2010 order in which Sheckles's statements were deemed admissible. The trial court's order focused on the following evidence regarding Sheckles's unavailability and Hammond's involvement:

(1) Hammond was aware that Sheckles was an indispensable witness because his initial indictment was dismissed due to an inability to locate Sheckles. He knew the Commonwealth could not proceed without her;

(2) When Sheckles finally appeared during motion hour in January 2009, Dejuan was in the courtroom when she was ordered to reappear for trial;

(3) After Cherry was murdered, Sheckles was the only remaining witness to the Sawyers murder;

(4) Dejuan only visited Hammond once in his first two and one-half years of incarceration yet visited him just days before his original trial date, days after he was reindicted (once Sheckles was located), and days after Sheckles was murdered. The trial court opined that this timeline firmly established collaboration between Hammond and Dejuan;

(5) Dejuan saw Sheckles in the courtroom, admitted that he knew her, and acknowledged that he knew she was a witness in his brother's murder trial. He told others he needed to "take care of matters" in Hammond's case;

(6) The Commonwealth produced documents indicating that relatives of Hammond and Dejuan told others that Sheckles was the reason Hammond was incarcerated;

(7) The Commonwealth produced evidence that established Dejuan's connection to the alleged shooter, Steven Pettway:[14] Dejuan admitted his

---

[13] Although the records are not before this Court, the trial court's 2013 order denying admission of the statements states that in his brief Hammond emphasized that the witnesses interviewed by detectives had serious credibility problems, such as self-interest motives to craft their testimony to receive better deals from the Commonwealth for their own crimes, as well as memory problems. Additionally, some of the witnesses relied upon did not provide information to police until two years after the Sheckles murder.

[14] Pettway was a juvenile at the time he murdered Sheckles, so only his initials were used in the trial court's 2010 order. However, as noted, he was tried and convicted for the Sheckles murder, and this Court affirmed his murder conviction in *Pettway v. Commonwealth*, 470 S.W.3d at 706.

association with Pettway and immediately thereafter requested his attorney; Pettway matched the description of the shooter (based on numerous eye-witness accounts, as Sheckles was shot in broad daylight in a crowded park); Pettway admitted to a friend that he shot Sheckles for Dejuan; numerous witnesses stated that Dejuan and Pettway were frequently seen together before and after the murder; the two have engaged in other criminal activity together;

(8) Sheckles was murdered in a park very close to the homes of Pettway and Dejuan;

(9) Hammond was the only party to benefit from Sheckles's demise; and

(10) Sheckles's statements carry indicia of truthfulness because she contacted the police on her own after recognizing Hammond in a television news report.

In addition to outlining the above evidence, the trial court noted that Hammond's motive for Sheckles's murder was palpable, and that "one would have to be blind to reality to reach a contrary conclusion."

The trial court's 2013 order denying the motion to admit Sheckles's statements noted the great efforts it employed in 2010 to research the issue, analyze the "voluminous" filings, and render a detailed opinion. The trial court summarized its reasons for ruling in favor of admitting the statements: (1) Sheckles was the only witness to the Sawyers murder; (2) Hammond knew Sheckles's identity and that the Commonwealth could not proceed without her because it dismissed one of the cases earlier in the proceedings when she could not be located. Hammond knew Sheckles would be killed and either actively participated in the murder or acquiesced to it for his own benefit; (3) Hammond had a motive to murder Sheckles; (4) Hammond was connected to the shooter by his brother; and (5) Sheckles's statements were reliable.

A fair reading of the trial court's order denying admissibility suggests that the court felt compelled to deny admissibility based on its

23

misunderstanding of the directives from this Court, despite the trial court's belief that the evidence was "substantial, credible, and well-founded." Having considered the record and applicable law, we conclude Sheckles's statements were properly admitted under the forfeiture-by-wrongdoing exception to the hearsay rule as directed by the Court of Appeals.

Pursuant to KRE 804(b)(5), the proponent of the hearsay in question must show "good reason to believe that the defendant has intentionally procured the absence of the witness, after which the burden shifts to the opposing party to offer credible evidence to the contrary." *Parker*, 291 S.W.3d at 668-69. The proponent "need only prove by a preponderance of the evidence that the defendant engaged or acquiesced in wrongdoing that made the declarant unavailable." *Id.* at 669. This standard requires "evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it." *Luna v. Commonwealth*, 460 S.W.3d 851, 871 (Ky. 2015). A trial court's decision on this type of evidentiary question will only be disturbed if clearly erroneous, *i.e.*, the trial court's findings must be supported by substantial evidence. *Hammond*, 366 S.W.3d at 433.

Based on the information available in this record, we find substantial evidence supported the trial court's initial decision to admit Sheckles's statements. Although the supporting documents are not available in the record, the trial court orders summarizing the documents reflect that there was "good reason to believe" that Hammond intentionally procured Sheckles's absence. The only contrary evidence offered by Hammond consisted of the

24

criminal records of witnesses and this did not meet his burden. Simply put, the Commonwealth's evidence was more convincing than Hammond's evidence. *Luna*, 460 S.W.3d at 871. The trial court reasonably inferred from the facts and circumstances presented that Hammond had the motive and means to procure Sheckles's unavailability. *Parker*, 291 S.W.3d at 670. Hammond has not offered any credible evidence to the contrary, indeed "[Hammond] has not pointed us to any place in the record where he offered such evidence." *Id.* While the criminal records of the witnesses interviewed by police were available for the trial court's consideration, they did little to counter the Commonwealth's theory. "The Commonwealth is not required to disprove all possible alternative theories or doubts that may exist; rather, it is only required to produce enough evidence to outweigh the evidence produced in opposition." *Luna*, 460 S.W.3d at 871.

This Court previously stated that "until some manner of accreditation was provided to cloak the information contained in the documents with even a modicum of reliability, the eighty-four page stack of papers did not become 'evidence,' and findings drawn from it cannot be regarded as being supported by 'substantial evidence.'" *Hammond*, 366 S.W.3d at 433. On remand, the Commonwealth authenticated the documents and evidence it presented to the court. Hammond did very little to challenge the Commonwealth's evidence. Substantial evidence supported admitting Sheckles's statements and accordingly we find no error.

25

## **CONCLUSION**

For the foregoing reasons, we affirm the judgment of the trial court.

Minton, C.J.; Hughes, Keller, Lambert, VanMeter, and Wright, JJ., concur. Nickell, J., not sitting.

COUNSEL FOR APPELLANT:

Scott Coleman Cox
Michael R. Mazzoli
Cox & Mazzoli PLLC


COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Thomas Allen Van De Rostyne
Assistant Attorney General
Office of Criminal Appeals