# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

**THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.**

RENDERED: MARCH 14, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0127-MR

KEVIN MADISON                                                          APPELLANT

V.
ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE BRIAN C. EDWARDS, JUDGE
NO. 19-CR-002230

COMMONWEALTH OF KENTUCKY                                              APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Kevin Madison (Madison) was convicted of one count of first-degree arson, five counts of first-degree wanton endangerment, and one count of third-degree criminal mischief. He was further found to be a first-degree persistent felony offender (PFO) and was sentenced to a total of seventy years' imprisonment. He now appeals his convictions and sentence as a matter of right. Ky. Const. § 110. He argues on appeal that he was entitled to a directed verdict for each of the charges against him, and that the jury's verdict required it to impermissibly stack inferences upon inferences. After review, we affirm.

## I.  FACTS AND PROCEDURAL BACKGROUND

In a light most favorable to the Commonwealth, the evidence presented at trial may be restated as follows. Madison and Shermain Reed (Shermain)

met while working at a VA hospital and were involved in a brief romantic relationship in the six months that preceded July 2019. At the time, Shermain lived in a two-story home at 2918 Rodman Street in the Churchill Downs area of Louisville with her three children, ages 15, 9, and 6. Madison's home at 3038 Hale Avenue was in the Parkland area of Louisville, a twelve-to-fourteen-minute drive to the northwest of Shermain's home.

By July 3, 2019, Shermain wanted to end her relationship with Madison. Between 11:49 pm on July 3 and 12:02 am on July 4 the following text messages[1] were exchanged between Madison and Shermain:

> **Madison:** I'm sitting in front of the house trying to feel horrible and how many mays (sic) I can possibly tell you I'm genuinely sorry
>
> **Shermain:** I'm over it. . . I'm ready to move on rather (sic) we figure it out or not
>
> **Madison:** Really
>
> **Madison:** Is that what you want to do
>
> **Madison:** Okay

Subsequently, between 12:03 am and 1:49 am, Madison sent six text messages and called Shermain twice, none of which were answered. About two hours later, he attempted to call Shermain at 3:38 am, 3:43 am, and 3:44 am; sent her a text message reading "you don't want to talk to me" at 3:47 am; and called her at 3:57 am. Shermain did not answer any of these calls or texts.

---

[1] We note that the calls and text messages discussed in this opinion were verified by both a Cellebrite data extraction from Shermain's phone and the certified cellphone records for Madison's phone number.

2

At 3:55 am, a security camera at a Reynolds Packing Company building one-tenth of a mile away from Madison's home captured an individual in light colored clothing and a white hat getting into a car that generally matched the description of Madison's vehicle, a maroon 2011 Buick Lacrosse with a front license plate, fog lights, a sunroof, and dark window tint. The vehicle traveled east on Hale Avenue, turned right, and began traveling south on 28th Street. The same vehicle was then captured a little over a mile away at 4:01 am by Louisville Metro Police Department (LMPD) cameras placed at the intersections of Dixie Highway with Wilson Avenue and Ormsby Avenue, respectively. The vehicle traveled east on Wilson Avenue, turned right, and began traveling south on Dixie Highway. During the course of these recorded events, Madison's vehicle was traveling southeast in the general direction of Shermain's home.

Roughly ten minutes later, at 4:10 am, a security camera at N Street Baptist Church captured a vehicle travel south on Rodman Street and make a right turn onto Heywood Avenue. Shermain's home sat on the corner of Rodman Street and Heywood Avenue, and her vehicle was parked in the street on Heywood Avenue next to her home. The church's security camera pointed across two vacant lots and captured the front of Shermain's house in the extreme top, lefthand side of the frame. The Commonwealth conceded that no positive identification was possible from the video, and from this Court's review it is indeed difficult to see the events at issue in the footage in any detail although the vehicle depicted clearly is a sedan. About five minutes after the car pulled onto Heywood Avenue, an individual can be seen crossing the street

3

and spending several minutes around Shermain's vehicle. That person then crossed the front yard and set a fire at the front door of the home. Although it is not captured in the video, a fire was also set at the back door. By 4:27 am, the individual returned to their vehicle and began to drive west on Heywood Avenue away from the home. The vehicle remains in view of the church's camera until 4:28 am when it takes a left turn out of frame.

While the events of the church footage were unfolding, Shermain and her three children were asleep inside the home. Shermain's twin sister Sher'Meka Reed (Sher'Meka) also happened to be there and was asleep on the living room couch on the first floor of the home. After the fires were set, smoke began pouring into the home causing Sher'Meka to wake up. She saw flames coming from the back door in the kitchen and began screaming that the house was on fire. Sher'Meka's screams roused Shermain and her children, and they were all able to escape the home, though they had to jump through three to four feet high flames at the front door to do so.

After the family escaped, they called 911 and stood on the sidewalk in front of the home to wait for first responders. While they were standing on the sidewalk, Shermain's two oldest children and Sher'Meka each saw Madison's car going south on Rodman Street away from the home and stopping at the stop sign at the end of the street. At that point in the road, Rodman Street ends, and one can either turn left or right onto Central Avenue; if one travelled straight, they would run directly into the backside of Churchill Downs. Sher'Meka testified that although it was still dark out, the area was well-lit due

4

to the lights at Churchill Downs, and she could clearly see Madison's car. She and both children testified that they saw Madison's car take a right turn onto Central Avenue and drive away. Shermain discovered sometime shortly thereafter that all four of the tires on her vehicle had been slashed and three of them were flat.

About forty minutes later, Madison resumed trying to contact Shermain for the first time since his previous attempt to call her at 3:57 am. Madison called Shermain at 5:10 am, and asked her, "what happened, what's going on?" Shermain testified that she had not told Madison about the fire prior to that call, and she did not know how he knew about it. Around the time that phone call occurred, video surveillance at the Reynolds building near Madison's home captured his vehicle pull up and stop near the area where his car had been previously parked. But instead of parking, the vehicle again drives east on Hale Avenue past the Reynolds building in the general direction of Shermain's home.

At 5:13 am, the two Dixie Highway cameras again captured Madison's car traveling east on Wilson Avenue, turning right, and traveling southbound on Dixie Highway. A few minutes before 5:26 am, Madison drove onto the scene at Shermain's home and parked on Heywood Avenue. By that time, first responders had arrived, and Captain Jason Sanders (Capt. Sanders) was interviewing Sher'Meka. When Madison's car arrived, she became upset and started yelling "he's here! That's the car!" Capt. Sanders immediately stopped his interview with Sher'Meka and went to speak with Madison, who was

5

wearing light colored scrubs and a white hat. Capt. Sanders immediately perceived that Madison had been drinking, as he smelled of alcohol and was acting disorderly and yelling.

Capt. Sanders placed Madison under arrest for alcohol intoxication and disorderly conduct and mirandized[2] him, but Madison waived his *Miranda* rights and agreed to be interviewed. Madison told Capt. Sanders that he had been at a nightclub on the night of July 3, had gone home at 10 pm, and did not leave his home again until Shermain called him and told him about the fire. Madison also acknowledged drinking a half pint of whiskey and told Capt. Sanders that he was still in love with Shermain. He denied any involvement in the fires.

Following Madison's arrest, Capt. Sanders looked through one of the windows on his vehicle and observed a white lighter and a box cutter with its blade extended in plain sight. The car was later towed to a secure lot and searched pursuant to a warrant. During that search officers found: a white lighter near the gearshift;[3] a box cutter with its blade extended in the passenger's seat;[4] a picture of Madison and Shermain; two more box cutters with their blades retracted, one in the center console and one in the front driver's side door storage slot; and several items indicating Madison's use of the vehicle (prescriptions, mail, wallet, and so on).

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[3] No cigarettes were found on Madison's person or in his vehicle.

[4] Capt. Sanders explained that this box cutter had originally been in the driver's seat but had to be moved to the passenger seat when the car was towed.

Capt. Sanders' arson investigation concluded that the fires at Shermain's home were deliberately set. The front door fire was set by lighting a shoe on fire, and the fire at the back door had been set using an accelerant. Debris from the fire set at the backdoor was forensically tested and was found to include a medium petroleum distillate. Examples of medium petroleum distillates include some charcoal starters, some paint thinners, and mineral spirits, though that list is not exhaustive.

At trial, Madison's defense emphasized that the Commonwealth had not proven beyond a reasonable doubt that he was the person that set the fire and slashed Shermain's tires. For the most part, he focused on what he believed to be the shortcomings in Capt. Sanders' investigation. Specifically, his failure to forensically test Madison's clothing and hands; his failure to test the lighter found in Madison's car for fingerprints; and his failure to test the box cutters found in Madison's car to see if they contained rubber that matched Shermain's tires. Capt. Sanders also acknowledged that no medium petroleum distillates were found in Madison's car, and that he did not search Madison's home.

Based on the foregoing evidence, the jury was instructed on one count of first-degree arson, five counts of first-degree wanton endangerment, one count of third-degree criminal mischief, one count of second-degree disorderly conduct, and one count of alcohol intoxication. The jury found him guilty on all counts except disorderly conduct and alcohol intoxication, and further found that he was a first-degree PFO. During the sentencing phase, the jury

7

recommended a total of 105 years' imprisonment for Madison's arson and wanton endangerment convictions to run concurrently with an agreed-to ninety-day sentence for third-degree criminal mischief. The circuit court later reduced the recommended sentence to seventy years' imprisonment as required by KRS[5] 532.110.

## II.    ANALYSIS

Before this Court, Madison argues that the trial court erred by denying his motions for directed verdict for first-degree arson, five counts of first-degree wanton endangerment, and third-degree criminal mischief. He further contends that, in order to convict him, the jury had to impermissibly "stack inferences" in violation of *Southworth v. Commonwealth*, 435 S.W.3d 32 (Ky. 2014), and *Luna v. Commonwealth*, 460 S.W.3d 851 (Ky. 2015). We address each argument in turn.

> When ruling on a motion for a directed verdict, a trial court must
>
> draw all fair and reasonable inferences from the evidence in favor of the party opposing the motion, and a directed verdict should not be given unless the evidence is insufficient to sustain a conviction. The evidence presented must be accepted as true. The credibility and the weight to be given the testimony are questions for the jury exclusively.

*Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983). "[T]here must be evidence of substance, and the trial court is expressly authorized to direct a verdict for the defendant if the prosecution produces no more than a mere scintilla of evidence." *Commonwealth v. Benham*, 816 S.W.2d 186, 187–88 (Ky.

---

[5] Kentucky Revised Statute.

1991) (citing *Sawhill*). An analysis of whether a trial court erred by denying a motion for directed verdict requires this Court to determine whether "under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Id.* at 187.

Madison's argument focuses on the testimony of Shermain's two oldest children[6] and Sher'Meka, all three of whom stated that they saw Madison's car turning off Rodman Street onto Central Avenue while standing on the sidewalk shortly after they escaped from the home. Madison claims based on the timestamps of the church surveillance footage that their testimony cannot be true, and therefore his guilt was not proven beyond a reasonable doubt.

The Commonwealth disputes the preservation of Madison's directed verdict arguments related to his first-degree arson charge. To preserve an alleged directed verdict error for appeal a criminal defendant must move for a directed verdict at the close of the Commonwealth's evidence and must renew the same motion at the close of all the evidence unless the defendant does not present any evidence. *Ray v. Commonwealth*, 611 S.W.3d 250, 266 (Ky. 2020). The motion must identify the specific charge the Commonwealth failed to prove and must specify the element or elements of that charge he believes the Commonwealth failed to prove. *Id.*

---

[6] Shermain's oldest child was nineteen years old at the time of the trial, and her second oldest child was thirteen years old.

Madison moved for a directed verdict at the close of the Commonwealth's evidence and did not present any evidence thereafter. In his motion, he contended that the Commonwealth failed to prove first-degree arson because it failed to prove that he started the fire with the intent to destroy or damage the building.[7] Next, he argued that the Commonwealth failed to prove first-degree wanton endangerment because it had not shown that his conduct manifested extreme indifference to the value of human life creating a substantial risk of death.[8] Finally, concerning his criminal mischief charge, the Commonwealth agreed with Madison's contention that it had failed to prove the original charge of first-degree criminal mischief, as it offered no proof of the value of Shermain's tires.[9] That charge was accordingly amended to third-degree criminal mischief[10] without further discussion.

Before this Court, Madison makes a sweeping argument across all seven of his convictions that the testimony from Sher'Meka and the children was the

---

[7] KRS 513.020(1)(a) ("A person is guilty of arson in the first degree when, with intent to destroy or damage a building, he starts a fire . . . and [t]he building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied[.]").

[8] KRS 508.060(1) ("A person is guilty of wanton endangerment in the first degree when, under circumstances manifesting extreme indifference to the value of human life, he wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person.").

[9] KRS 512.020(1)(a) ("A person is guilty of criminal mischief in the first degree when, having no right to do so or any reasonable ground to believe that he or she has such right, he or she intentionally or wantonly: . . . Defaces, destroys, or damages any property causing pecuniary loss of one thousand dollars ($1,000) or more[.]").

[10] KRS 512.040(1)(a) ("A person is guilty of criminal mischief in the third degree when: . . . Having no right to do so or any reasonable ground to believe that he or she has such right, he or she intentionally or wantonly defaces, destroys, or damages any property causing pecuniary loss of less than five hundred dollars ($500)[.]").

only evidence to tie him to the church surveillance video, and that their testimony "cannot be true." Consequently, Madison argues before this Court that the Commonwealth failed to meet its burden on all charges because he could not be tied to the church surveillance video. But, before the trial court he asserted that the Commonwealth failed to prove he committed first-degree arson because it failed to prove he intended to destroy or damage the home, and that it failed to prove first-degree wanton endangerment because it did not prove that his conduct manifested extreme indifference to the value of human life creating a substantial risk of death. Moreover, he made no further arguments concerning the criminal mischief charge after it was reduced from first-degree to third-degree based on the Commonwealth's failure to prove a monetary value. We are therefore inclined to agree with the Commonwealth that Madison's directed verdict arguments on appeal are not preserved, as he has fed one kettle of fish to the trial court and another to this Court. *See, e.g.*, *Owens v. Commonwealth*, 512 S.W.3d 1, 15 (Ky. App. 2017). We further note that he did not request review for palpable error pursuant to RCr[11] 10.26. Nevertheless, upon review, we do not agree with Madison's conclusions concerning the church security video and hold that no error occurred.

First, some context about the neighborhood at issue is required. As shown in a map submitted to the jury, Heywood Avenue runs to the east of Rodman Street. Heywood is a relatively short street and at the end of it is a

---

[11] Kentucky Rule of Criminal Procedure.

11

curve, rather than a turn, that feeds into South 9th Street.  If one were to continue on South 9th Street for a short distance, they would have the option to turn left onto Burton Avenue, which is the street directly south of Heywood Avenue.  If one were to take the left turn onto Burton Avenue and continue straight, they would end up back on Rodman Street approximately one block down from Shermain's home.  In simpler terms, Heywood Avenue to South 9th Street to Burton Avenue makes an elongated "C" shape that begins and ends on Rodman Street.

With that established, Madison claims that the vehicle captured on the church surveillance video was out of the camera's sight for two minutes before the victims began to exit the home and therefore, they could not have seen it. But that is not an accurate representation of the evidence.  In the video, the suspect's vehicle begins to drive away from the house at 4:27:17 am.  The vehicle remains in view of the camera until 4:28:11 am, when it enters the curve onto 9th Street.  Figures can then be seen coming out of the home beginning at approximately 4:28:20 am, and at least three figures can be seen standing on the sidewalk at the corner of Rodman Street and Heywood Avenue by 4:29:27 am.

Madison is accordingly correct that Sher'Meka and the children could not have seen his car on Heywood Avenue, but that was never their testimony. Rather, they testified that they saw his car at the end of Rodman Street turning right onto Central Avenue.  It would not be unreasonable to believe that Madison took the "C" shaped route from Heywood Avenue to Burton Avenue,

12

turned right onto Rodman Street, and stopped at the stop sign at the end of Rodman Street. Nor is it unreasonable to believe, given the timeframe, that Sher'Meka and the children saw his vehicle as it stopped at the stop sign and turned onto Central Avenue. And, the credibility of their testimony was properly left to the province of the jury. *Sawhill,* 660 S.W.2d at 5.

We therefore disagree with Madison's contention that the testimony of those three witnesses could not have been true and hold that it would not have been clearly unreasonable for the jury to find him guilty. Consequently the trial court did not err by denying his motion for directed verdict, questions as to preservation notwithstanding.

Nor do we agree with Madison's assertion that the jury's verdict required impermissible inferences upon inferences in violation of *Luna* and *Southworth, supra.* As stated in *Luna,* our inferences upon inferences jurisprudence can be summarized as follows:

> Our rule barring a string of inferences is not absolute, "despite being stated in absolute terms. If that were the case, then the exercise of logic, which frequently employs inference-derived inferences, would not be allowed to the jury." Instead, our rule is "intended to condemn inferences that build upon inferences in an **unreasonable** manner."

460 S.W.3d at 888–89 (emphasis added) (footnotes omitted) (quoting Southworth, 432 S.W.3d at 45-46). Stated differently, "as long as an inference is grounded in common sense and experience, in reason and logic, and in the evidence at trial, it should be allowed and, indeed, embraced." *Southworth,* 435 S.W.3d at 46.

13

Madison argues that the jury had to stack inferences with regard to the security camera evidence. First, he argues, the jury had to infer that the maroon Buick captured by the Reynolds security camera and the similar car seen on the Dixie Highway[12] cameras was the same vehicle. Second, it had to infer that the car was going to Rodman Street specifically. And third, it had to infer that the car was the same unidentifiable car captured in the church security video. However, none of these inferences were unreasonable.

Madison himself concedes that the first inference was reasonable but argues that the second and third inferences were not based on his contention that it was not possible for Sher'Meka and the children to have seen his car leaving the scene. For the reasons already stated, that testimony was not impossible, and the credibility of that evidence was properly left for the jury to determine. It was also not unreasonable to believe that the vehicle captured in the Reynolds building footage and the Dixie Highway footage, respectively, was traveling to Rodman Street, as the car was traveling in the general direction of Rodman Street between those two points. This, in combination with the other evidence presented—the timeline of the events; Madison's motive; Madison lying to Capt. Sanders about his alibi; Madison lying to Capt. Sanders about

---

[12] Madison's brief states that the inference must be that the Reynolds footage and the Algonquin Liquor footage were the same. But we discern this must be a misstatement. There was no footage from the Algonquin Liquor store prior to the fires being set. The Algonquin Liquor footage refers to footage recorded at 5:21 am outside of the Algonquin Liquor store when Madison was driving back to Shermain's after the fires had been set. In that footage, nothing about the vehicle can be seen other than it was driving fairly fast, had its emergency lights on, and was driving in the direction of Shermain's home; the connection being that Madison had his emergency lights flashing when he arrived back at the scene.

how he knew of the fire; the items found in his car; and Madison's clothing being consistent with the individual seen in the initial Reynolds building footage—we cannot say that the jury's belief in Madison's guilt was the result of unreasonably stacked inferences.

## III. CONCLUSION

Based on the foregoing, we affirm Madison's convictions and sentence.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Michael Christian Lemke
Louisville Metro Public Defender

Joshua Michael Reho
Louisville Metro Public Defender

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Joseph A. Beckett
Assistant Attorney General